## TYRA et al. v. ADLER.

### No. 10610.

Circuit Court of Appeals, Eighth Circuit.

Sept. 8, 1936.

Harold Olsen and A. C. Paul, both of Minneapolis, Minn. (Paul, Paul & Moore, of Minneapolis, Minn., on the brief), for appellants.

John E. Stryker, Jr., of St. Paul, Minn. (John E. Stryker, of St. Paul, Minn., on the brief), for appellee.

Before WOODROUGH and THOMAS, Circuit Judges, and DEWEY, District Judge.

THOMAS, Circuit Judge.

By bill in equity the plaintiff charged that the defendants had jointly and severally infringed a patent, and he sought injunctive relief and damages. There was a judgment and decree for the plaintiff and the defendants appeal. Pending the appeal defendant Thomas Finn died, and his personal representative having appeared and so requested, the appeal as to him has been dismissed.

The patent, No. 1,843,748, was issued to the plaintiff February 2, 1932. The application therefor was filed May 10, 1930. The patent relates to an antiwashout device for roadways. Only claims 1, 2, 3, and 8 are involved in this suit. They read as follows:

"1. An anti-washout device for roadways or the like comprising a sheet metal member adapted to be secured in upright position, longitudinally of the road grade and having a lower portion formed to be imbedded in the road, a laterally bent flange extending along the upper edge of said member and means for retaining said member in upright position with its upper portion above the road grade to direct water longitudinally of the road.

"2. An anti-washout device for roadways comprising a long, narrow strip of sheet metal, adapted to be secured upon the surface of the road grade, longitudinally thereof, and having a bend located at the surface of the ground and imperforate portions adjacent to said bend, and means for retaining said strip in upright position to direct surface water longitudinally of the road.

"3. An anti-washout device for the shoulders of roadways or the like, comprising rigid metal strips adapted to be secured end to end along the shoulder of the road, a bend extending longitudinally of said strips at the surface of the roadway, the portions of said strip adjacent to said bend being imperforate, and the upper portion of said strips being formed to engage supporting members above the road grade, laterally bent flanges along the upper edges of said strips and supporting members adapted to be driven into the road grade for retaining said strips in upright position.

"8. An anti-washout device for roadways or the like, comprising sheet metal members adapted to be secured end to end in upright position, longitudinally of the road grade and having lower portions formed to be imbedded in the road, longitudinal bends formed in said members to be located upon the surface of said grade, imperforate, longitudinal portions of said strips immediately adjoining said bend to direct water longitudinally of the road, and means for retaining said members in upright position with said imperforate portions above the road grade."

The defendants admitted that they make and market a device for preventing washouts on highways, but deny infringement. They allege that the patent is invalid for want of novelty in view of the state of the arts relating to roads and means of preventing washouts thereon as practiced prior to the alleged invention.

The utility of such a device as that disclosed by the patent is not questioned. In the construction of highways, particularly in a hilly country, it is necessary to construct a great many fills, sometimes as much as 40 feet deep, extending for considerable distances along the road. After the grade has been constructed, a period of a year or more is required for the earth to settle before the final hard surface can be satisfactorily applied. During this period a great deal of trouble and expense is in-

curred by the frequent washing away of such newly formed grades. The patent in question was devised for the purpose of eliminating as far as possible the washouts which generally result from the water flowing over the shoulder of the grade. Prior to the use of the device covered by the patent no satisfactory method of preserving grades before stabilization by settling had been developed. The old practice was to fill the gutters eroded by the rains with earth after every washout. The testimony shows that the use of the plaintiff's device effected a saving of from $500 to $5,000 a mile on fills sloping longitudinally.

The patented device consists of several parts. There is first a strip of metal having a bent over flange along its top edge and a longitudinal bead or corrugation located substantially centrally of the width of the strip. These sections of the metal strip, as manufactured, are approximately 6½ inches in width and 10 feet in length. In order to obtain the desired length of strip on a stretch of road provision is made for joining together a plurality of such sections by means of a notch at one end of each section to receive a flange oñ the adjacent end of the next section. Each section of the antiwashout strip laps over the next section about 1½ inches. The adjoining sections are held in place in an upright position by means of stakes which pass through openings in the top flange and in the upper surface of the central corrugation. In preparation for the installation of the antiwashout strip a small trench about 1½ inches by 3 inches deep is channeled approximately 4 inches from the edge of the shoulder of the road. The strip is then placed in the trench to a depth of about 2 inches so that the central corrugation rests upon the ground. The trench is then filled and the device is protected by placing a small amount of earth against it on the outer edge of the shoulder. The device is particularly useful where there is a longitudinal slope in the road. It is intended that the water will run along the concave or convex side of the corrugation, depending upon which side of the bead faces the road, until it reaches a low place, as at the bottom of a slope, where preparation is made for its outlet. The outlet is made by removing one section of the strip at such low point and in its stead placing a surface drain outlet. The outlets consist of four parts. Short wing strips are attached to the antiwashout strips. To the wing strips is bolted an apron or flat piece of metal

attached to which is a tapered trough. The last piece in the mechanism is a sleeve riveted to the bottom end of the drain and emptied into a flume. The flume is the means by which the water is carried from the surface drain outlet down the slope at the side of the road.

Some time after he received his letters patent the plaintiff was advised that the defendants were offering to sell to the Minnesota Highway Department an antiwashout device similar to the one patented. Individual notices of infringement were sent to the three defendants, two on July 27, 1933, and the other on September 7, 1933. Subsequent to August 7, 1933, the Minnesota State Highway Department made certain purchases from the defendants and the strips thus purchased were used on newly formed grades.

Upon the trial of the case in the lower court plaintiff introduced testimony showing the need of an antiwashout device; how the patented device would take care of the hazards in road building for which it was intended; and the alleged infringement. The patented device was put on the market about the middle of the year 1929. From that date until 1934 the sales including accessory drains, basins, flumes, etc., amounted to approximately $150,000. In lineal feet the sales in the state of Minnesota and surrounding states were in that period a little over 750,000.

No direct testimony on behalf of the defendants was offered. However, they introduced several exhibits in evidence. Exhibit A is a drawing of a wood antiwashout device, referred to later in this opinion as the Kipp experiment. Exhibit B is a certified copy of the file wrapper contents and drawing of the Adler patent, introduced for the purpose of showing that the plaintiff had limited his claim to a strip that had imperforate portions adjacent to the central bend. Exhibit C is a book of prior art patents containing in all nine United States patents, all of which were issued prior to the date of the invention by Adler. Because the plaintiff had not received notice of these patents as required by statute (35 U.S.C.A. § 69), the book was received in evidence for the limited purpose of showing the state of the prior art and not to show anticipation of the patent in suit.

The court below held that the patent of the plaintiff was valid and that claims 1, 2, 3, and 8 had been infringed by the defendants. The relief prayed for by the plain-

tiff was accordingly granted. It is the position of the defendants on this appeal that in view of the prior art as shown by the prior patents included in Exhibit C and the prior public use as shown by Exhibit A the court below should have held the patent in suit void for lack of invention. They further contend that with respect to claims 2, 3, and 8 of the patent in suit there has been no infringement, because the claims were restricted to a strip that had imperforate portions adjacent to the central bend while their device has perforations in the longitudinal strip both above and below the central corrugation, which constitutes a material difference between the two devices.

We shall first consider the question of the validity of the patent. This question involves a determination of whether the patented device discloses invention or only such an adaption of elements of the prior art as might be made by any skilled mechanic. If it be found that the patent is valid, it will remain to consider whether in view of the prior art the claims of the patent must be so narrowly construed that they are not infringed by the accused device.

Since the present era of building hard-surfaced roads began a few years ago, highway engineers endeavored to find some means of preventing the washing away of the embankments of unsettled earth by heavy rainfalls. The evidence shows that many efforts were made and many experiments tried to solve this problem. The engineers experimented with the spreading of manure on the shoulders and covering it with chicken wire. They tried the planting of vegetation along the shoulders. Mr. Orin L. Kipp, a highway engineer connected with the Highway Department of Minnesota for twenty years, testifying for the plaintiff, described an experiment tried in 1926 on a road in Minnesota, consisting of placing 2″ x 6″ planks end to end along the shoulder of the grade to prevent the water from spilling over the embankment and washing away the loose earth. It is claimed by defendants that the patent here lacks invention because it amounts only to a substitution of metal strips for the wooden planks used by Kipp. While Kipp's experiment may serve to narrow the claims of the patent, it is not fair to say there was a mere substitution of metal for wood in the device. The purpose of the two instrumentalities was the same, i. e., to conduct the water longitudinally along the top of the shoulder to a flume where it would be carried to the ditch or drain at the bottom of the grade; but the experiment with the planks was a failure while the patented device was a success. The settling of the earth threw the planks out of alignment, opened crevices through which the water leaked and destroyed the flumes, and for several reasons proved impractical. Because of its failure it was not used again. The longitudinal bead or corrugation of the patent which kept the strip of metal in a straight line and the secure and nonleakable joints between the sections were absent from the planks.

The prior art patents introduced in evidence by the defendants were not intended to serve the same purpose as the patent, and, for the most part, belong to different arts. The Thornton patent relates to the drainage of mud roads and consists of furrows along the sides of the road with a hollow drain tile under the center of the crown covered with gravel or other porous material.

Bicknell's and Brookman's patents cover a metallic edging for lawns and flower beds to prevent the grass from spreading to the roadways and to afford drainage for the latter. Bicknell's device consisted of a series of connected V-shaped panels sunk in the ground at the edge of the grass and along the roadway, the flange next to the road or path being perforated to permit water to percolate into the V-shaped gutter. Morss' patent relates to a combined curb and gutter made of metal for use at the edge of paved streets.

Neither the Thornton, Brookman, Bicknell, nor Morss patents contain any elements intended to perform the function of the metal strips found in the patent. They differ also in material structural features.

The Burrell, Wood, and White patents all relate to parting strips or confining walls used to define and separate contiguous sections of concrete in paved roadways and sidewalks when under construction. The parting strips, while differing in minor details, are all made of metal in sections. They are intended to be placed on top of the ground and held in place by stakes. The Burrell strip is provided with an angular bead about the center of its width for the purpose of forming a tongue on one of its sides in the cement and a groove on the opposite side. The Burrell and White patents were both considered by the experts in the Patent Office when the patent in suit was granted. We have read

`552`

all these patents and we find nothing in them in any way to suggest their use for the purposes of the Adler patent. The function of the parting strips is entirely different from that of the strips in the Adler patent. In use they are placed on top of the ground and not imbedded in it, and the purpose of the bead is entirely different in the two cases. The parting strips do not teach the Adler invention. Eibel Process Co. v. Paper Co., 261 U.S. 45, 67, 43 S.Ct. 322, 67 L.Ed. 523.

The Mack patent is for a metal drain for roadways. It does not run longitudinally along the road, but consists of a metal spout to carry the water from the top of the roadbed over the shoulder of the grade. It is anchored in place by a metal "apron," and may be moved from place to place with little trouble. It is intended that water shall be led longitudinally along the road to the spout by earth embankments 8 to 10 inches high and from 1½ to 2 feet in width. The Mack patent in 'no way suggests a washout strip along the shoulders of the highway and cannot be said even to limit the scope of the Adler patent.

The Marengo patent relates to a fence or barrier for preventing the movement along the ground of locusts and like insects. The fence consists of a plurality of rectangular plates placed adjacent to one another and held in place by stakes driven through slots in ears projecting from the plates. The fence so constructed is on the top of the ground; it lacks the bead or corrugation and the top flange of the Adler device; and its use is wholly different from the patented device in suit.

A study of the prior art urged upon our attention is convincing that the Adler patent is not even foreshadowed in any of the devices studied, except in the unsuccessful experiment with the 2″ x 6″ planks by the Minnesota State Highway Department under the supervision of Kipp. It may be strange that the highway engineers who made that experiment did not think of the metal strip with the corrugation, the top flange and the overlapping ends as a flexible but firm barrier to force the flow of water longitudinally along the embankment of loose earth; but they did not. Neither did any of the hundreds of highway engineers working on the same problem throughout the country during the years of experimentation think of it. This fact is some evidence that Adler's discovery constituted invention. The Supreme Court said in the Barbed Wire Patent Case, 143 U.S. 275, 282, 283, 12 S.Ct. 443, 446, 36 L. Ed. 154, that "courts have not been reluctant to sustain a patent to the man who has taken the final step which has turned a failure into a success. In the law of patents it is the last step that wins." Adler's device seems at once upon its discovery and introduction to have supplied the need and to have solved the problem. It is the law that "Where the method or device satisfies an old and recognized want, invention is to be inferred, rather than the exercise of mechanical skill. For mere skill of the art would normally have been called into action by the generally known want." Paramount Publix Corp. v. Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 454, 79 L. Ed. 997. It is insisted that the patent in suit lacks invention because the metal strips used resemble in some respects the parting walls of the Burrell, Wood, and White patents used in concrete paving and sidewalks, and the case of Tropic-Aire v. Sears, Roebuck & Co. (C.C.A.8) 44 F.(2d) 580, 588, is cited to sustain the contention. The cited case is not in point. In the cited case both patents involved related to the art of heating and the devices both performed the same functions. In this case the arts are wholly different and the functions distinct. Metal strips may be used in innumerable industries, but that fact does not prove want of novelty and invention in a combination where they are used in a new way with new adaptations and for a wholly different purpose, especially where as here the modifications effect a new and beneficial result. Potts & Co. v. Creager, 155 U.S. 597, 607, 15 S.Ct. 194, 39 L.Ed. 275; Silver-Brown Co. v. Sheridan (C.C.A.1) 71 F.(2d) 935, 937.

We conclude, therefore, that the Adler patent is valid.

We next turn to the question of infringement. The device marketed by the defendants is similar to the Adler patent and is used for the same purpose. In argument it is not contended the accused device does not infringe claim 1 of the patent, if valid. The argument is addressed to claims 2, 3, and 8. Reliance for reversal is placed upon the principle that "The absence from a device that is alleged to infringe a patented combination of a single mechanical element of that combination is fatal to the claim of infringement." Mallon v. Gregg & Co. (C.C.A.8) 137 F. 68, 79.

The three claims in question each provide that the portions of the metal strip adjacent to the central longitudinal bead or bend are imperforate. When plaintiff's application was pending in the Patent Office the White and Burrell patents were cited as anticipations. In a communication to the Patent Office under date of February 24, 1931, the applicant said: "None of the devices or the references are either intended or adapted as anti-washout strips for unpaved shoulders or roadways. It is believed that applicant is the first to suggest a method of protecting such shoulders by a baffle strip extending longitudinally thereof. The devices of Burrell and White have two defects which render them unsuited for applicant's use. First, the upstanding upper edges of these prior devices would present a constant source of danger and would be apt to cut the feet of cattle or other animals and tires of motor vehicles crossing or passing along the roadway. Secondly, even if it were obvious that the lower portions of the devices of the references might be embedded in the ground, the lower set of openings 8 of Burrell and 20 of White would allow the escape of water tending to follow the strip and result in channeling the shoulder laterally."

The patent was upon receipt of these observations issued. The contention now is that claims 2, 3, and 8 are limited to metal strips without perforations adjacent to the bead or bend, Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707, and that as so construed the defendants' device does not infringe, because it has a series of perforations above and below the bend. An examination of the two devices and the testimony shows that the principles relied upon by defendants are not applicable to the devices under consideration. In the Adler device it is clear that the portions of the strip referred to as free from perforations were the parts along which the water runs, where as pointed out in the foregoing communication perforations "would allow the escape of water tending to follow the strip and result in channeling the shoulder laterally." The same purpose is clearly expressed in claim 8 of the patent where it is said the "longitudinal bends formed in said members" are "to be located upon the surface of said grade, imperforate," and the "longitudinal portions of said strips immediately adjoining said bend to direct water longitudinally of the road * * * with said imperfo-

rate portions above the road grade." Perforations, therefore, in some other portion of the metal strip, which would not "allow the escape of water tending to follow the strip," would not constitute a material difference in the two devices. The perforations in defendants' device, claimed to render it different from the patent, are located at the end of the sections, one near the top and one near the bottom of the strip, the bottom one being imbedded in the ground when the strips are in place. Neither opening is at the water channel. Besides, such perforations are intended for the admission of a clip used to fasten the metal strip to a stake, and when the clip is inserted the openings are filled. It cannot, therefore, be said that the one device differs from the other in any material sense on account of the presence or absence of perforations. Here, the defendants have copied the plaintiff's device in almost every detail. Such minor differences as exist are unrelated to the functional parts. The two devices do the same work in identically the same way. They are the same, therefore, in law, and the one infringes the other. Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Freeman v. Altvater (C.C.A.8) 66 F.(2d) 506, 510; Smith v. Snow, 294 U.S. 1, 20, 55 S.Ct. 279, 79 L. Ed. 721.

The judgment and decree appealed from are affirmed.