## HARTFORD–EMPIRE CO. v. COE
### (three cases).
### Nos. 6544–6546.

United States Court of Appeals for the District of Columbia.

Argued April 9, 1936.

Decided Dec. 7, 1936.

Vernon M. Dorsey and Alan F. Garner, both of Washington, D. C., and Sidney F.

Parham, of Hartford, Conn., for appellant.

R. F. Whitehead, of Washington, D. C., for appellee.

Before MARTIN, C. J., and VAN ORSDEL, GRONER, and STEPHENS, JJ.

VAN ORSDEL, J.

Plaintiff-appellant, the Hartford-Empire Company, filed three bills of complaint in the Supreme Court of the District of Columbia, under section 4915, R.S., as amended (35 U.S.C.A. § 63), where the cases were tried on a single record. While the cases are here in separate appeals, they are on a single record.

No. 6544 relates to the Peiler application, No. 823,894, filed March 10, 1914. Appeal No. 6545 involves the application of Steimer, No. 543,582, filed February 12, 1910. Appeal No. 6546 relates to an application of Steimer, No. 65,185, filed October 27, 1925 as a division of the original Steimer application involved in Appeal No. 6545.

The applications here involved all relate to the feeding of molten glass to molds in the production of bottles, jars, and other kinds of glassware. The claims in No. 6544 and No. 6545 are process claims. The claim in No. 6546 is an apparatus claim.

In No. 6544 claims 2 and 92 sufficiently define the alleged invention:

"2. The method of feeding molten glass, which consists in accumulating and suspending masses of the glass in a heated atmosphere, and successively shearing mold charges from the accumulations when such charges have attained the desired size while thus suspended at a plane sufficiently far below the plane of suspension of said masses to prevent smearing of the glass during the shearing of said charges.

"92. The method of feeding molten glass from a submerged discharge outlet in the bottom of a container in periodically severed compact mold charges, comprising the steps of controlling the temperature and viscosity of the glass as it passes to the outlet and regulating the rate of flow of the glass through the outlet to cause glass to issue from the outlet at such rate and in such condition that a compact mass comprising enough glass for the desired mold charge will accumulate in suspension below the outlet between successive charge severing operations, and severing mold

charges from the successive suspended masses by causing shear blades to cut cleanly through each suspended mass at a plane spaced sufficiently below the outlet to be out of glass smearing relation therewith, the viscosity of the glass flowing to the outlet, the rate of flow through the outlet, and the periodicity and rate of the charge severing operations of the shears all being selected and regulated with relation to one another for coaction to cause the accumulation in suspension of mold charge masses of suitable size and consistency before the respective severing operations and the severance from the suspended masses, at the proper times for proper delivery to the molds of an associate glassware fabricating machine, of compact uniform mold charges, each having a weight appropriate for the mold to be fed and each being of suitable viscosity and condition for shaping in the mold for the production of a practically perfect article of hollow glassware."

The claimed invention in this case consists in forming from the molten glass contained in the melting furnace a regulated succession of mold charges, each having proper weight, compactness, and viscosity for fabrication in a mold into an article of glassware. Each charge is formed while freely suspended in the air, and while it remains connected with the glass in the furnace. When formed, it is mechanically cut off and dropped into the mold where it is converted into the intended article of glassware. To accomplish this result, the various steps taken must be co-ordinated with each other in an exact manner to accomplish the desired result.

In practicing the present method, the viscosity of the glass is so affected above the submerged orifice that the glass from which the charge is to be cut emerges in a "pasty" or highly viscous condition so that it will remain suspended in a mass which will hold itself in compact form until more than sufficient glass for a mold charge has accumulated.

It is well to point out that Peiler's method, known as "pasty glass suspended charge feeding," is in distinction to the mechanical methods of the prior art which employed hot, liquid glass. The term "pasty glass" is defined as a highly viscous condition referred to as "super-viscous" in Hartford-Empire Co. v. Hazel-Atlas Glass Co. (C.C.A.) 59 F.(2d) 399, where the court was considering Peiler's patent No. 1655391, covering an invention involving an improvement of the method here in issue. This pasty or highly viscous condition is essential to the method here used in that it enables the suspension of a mass which holds itself in compact form.

It appears that Peiler is a rather distinguished inventor in this field, and has filed numerous other applications and obtained a number of patents relating to the method of feeding molten glass to the molds. The appellant company has been involved in a number of suits in connection with these Peiler patents, and special stress is laid by appellant on the case of Hartford-Empire Co. v. Hazel-Atlas Glass Co. (C.C.A.3d) 59 F.(2d) 399. That suit involved a patent granted to Peiler in 1928 on an application filed in 1919, which is known as the "plunger" patent. That process disclosed a plunger which operated in a vertical direction over the opening through which the molten glass passed from the furnace, and its function was to control the amount of glass passing through the orifice.

In the Hazel-Atlas Case the court paid a great tribute to Peiler for revolutionizing the art and supplying an "urgent and desperate need" of the bottle manufacturing industry. The patent there under consideration came into competition with what was known at the time as the Owens method. The Owens machine was so expensive (costing $80,000) that it was controlled by a few manufacturing companies. The Peiler device, being much cheaper, and being an improvement over the Owens method, had through competition supplanted almost entirely the use of the Owens method. The court, however, in that case was not considering an apparatus or process such as is disclosed by Peiler in the present case, but the process and apparatus of the later Peiler patent. The court treated the patent there under consideration as involving a complete solution of the problem.

That court, while considering devices of Peiler to regulate the out-let flow from the molten mass, referred to the gob feeding process here under consideration and distinguished it from the prior art in the following statement [59 F.(2d) 399, at page 407]: "By this use of a pulsating, vertical plunger so synchronized that the initial discharged mass or gob was held in suspension while there was fed into its upper end glass hotter and more fluid,

whereby the gob's viscous skin surrounding was evenly expanded on all sides to the desired mold shape and then the flow of glass was stopped, the gob sheared, and the glass at the orifice withdrawn so as not to smear the shears. The periodic, separated, individualized mold forms or gobs discharged by this current-intercepted process and its contrast with the continuous feed stream of the earlier art are described by the union official [president of the Glass Blowers' Union] just referred to in language we now repeat and whose keen accuracy will be better appreciated from what has been shown in the intervening part of this opinion. Accordingly we repeat his words: 'Instead of employing a stream of glass which collected in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during the suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received.'"

In the case of Hartford-Empire Co. v. Nivison-Weiskopf Co. (C.C.A.) 58 F.(2d) 701, 704, the court had before it for consideration some of the Peiler patents and a patent to Steimer, granted as a division of the application here in suit. In that case the court held "that Peiler was not the inventor of suspended charge feeding or shaping charges while in suspension," and relied upon the prior disclosures of Hitchcock, Brookfield, Lot, and others.

The Board of Appeals in the Patent Office rejected the claims here in issue chiefly upon the Hitchcock patent, No. 805068. An examination of the Hitchcock patent discloses that it was not a gob feeding device. What Hitchcock did was to pour the molten glass into the mold and when the mold was filled to a proper proportion the narrow string of glass between the mold and the molten mass from which it is drawn was severed and the portion above the point of severance was drawn back to the molten mass while the portion below curled down into the mold. The evidence disclosed that this method had some imperfections in that the portion of the string that coiled into the mold would not properly amalgamate, thus resulting in defects in the glassware. Hitchcock does not disclose the dropping of a gob of molten glass into the mold. He states in his specification that "when a sufficient quantity has been placed in the mold the glass between the discharge orifice and the mold is severed." In actual operation the drop reaches the mold long before the thread is cut, and the gob, if any is formed, is not in a completed condition as in the present invention. Clearly Hitchcock did not disclose a method of gob feeding as contemplated in the present case. His method was more in the nature of a pouring process.

In the case of Hartford-Empire Co. v. Obear-Nester-Glass Co. (C.C.A.) 39 F.(2d) 769, 770, infringement was charged by the Hartford Company of two patents issued to and owned by it, the Steimer patent No. 1564909 granted December 8, 1925, and the Peiler patent No. 1573742 granted February 16, 1926. Infringement was denied by the defendant, and the validity of the patents put in issue based upon the prior art. Also delay and laches in the prosecution of the patent proceedings in the Patent Office were pleaded and relied upon. The court held as to these patents that there had been no delay and laches sufficient to raise any question of estoppel in the case. The issue involved was stated by the court as follows: "Both of the patents declared on in the bill of complaint relate to the automatic feeding of molten glass to a series of forming molds in which the glass charges are shaped to final form." The court in an able and voluminous opinion disposed of the prior art holding that the patents to Brookfield, Cleveland, Hitchcock, Mansfield, Morrison, Proeger, Schulze-Berge, Severin, and the French patent to Wilzin did not anticipate the patents to Steimer and Peiler in issue. We are in full agreement with the disposition of the prior art as set forth in that opinion. In no case to which our attention has been directed has the process disclosed by Peiler been sufficiently anticipated to justify the disallowance of his claims, nor do we agree with the Board that Peiler's method is described by Hitchcock. What constitutes anticipation of method claims in connection with carrying out a process is clearly defined in Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 422, 424, 22 S.Ct. 698, 706, 46 L.Ed. 968, where the court held in substance that method claims can only be anticipated by a similar method, and that method claims cannot be anticipated by "a piece of mechanism by which the process might have been performed," and further that method claims cannot be an-

ticipated by earlier devices which require alteration to carry out such a process, unless, at least, such use would have occurred to one whose duty it was to make practical use of the mechanism described. In Re Moulton, 40 App.D.C. 160, this court, referring to the rule in the Carnegie Case, said: "It is also true, as contended by the appellants, that a process is not anticipated by a prior mechanism, by which, with some alterations, it might have been performed. It is not only necessary that the prior patents might have been used to carry out the process, but that such use was either contemplated or would have occurred, in the ordinary mechanical operation of the device."

Applying this rule to the invention here in issue it must be remembered that the result to be obtained is the successful feeding in regular succession of similar mold charges, and that this result can only be accomplished by the combination of steps which are set out in the method claims in issue.

In the last analysis the claims here in issue were refused by the Board of Appeals, and the court below, upon the unwarranted assumption that one skilled in the art, prior to Peiler's discovery, possessed all the knowledge that Peiler possessed after applying to this problem for years all his superior skill in this art. It means that the knowledge so possessed by those skilled in the art included Peiler's "pasty glass suspended charge feeding method" and of all the developments attending the glass feeding art as described by the Peiler method. In other words, it means that any person skilled in the art would have been able to proceed against the teachings of Hitchcock that the glass should be heated to a thin liquid form and fed in ball and tail, or drop in thread charges and change the Hitchcock method, structure, and mode of operation to perform Peiler's pasty glass suspended charge feeding method. We have had occasion in many instances to condemn the hindsight nunc pro tunc method employed to justify the refusal of valuable inventions in which the patentees are entitled to the protection afforded by the Constitution and the laws.

Coming to Appeal No. 6545 involving the application of Steimer, No. 543582 filed February 12, 1910, we find that the alleged invention here disclosed is expressed in the following claims: "5. The process of separating molten glass into mold charges which consists in intermittently flowing the glass in an annularly converging flow to the outlet, discharging the glass periodically through the outlet, temporarily suspending the discharged glass in successive masses beneath the outlet and separating each mass from the outlet while so suspended.

"26. The method of forming masses of molten glass that comprises causing glass to flow from a parent body through an opening, causing successive portions of the glass, as they emerge from said opening, to hang freely below the opening, and then detaching the said successive portions of glass before they are received in any receptacle."

It is difficult to understand just how the Steimer application can be held as anticipating Peiler, since Peiler's proper date is 1914; and appellant's amendment of the Steimer application, covering this invention, is dated February 4, 1920.

In the Nivison-Weiskopf Case, supra, the court, considering the Steimer patent, said: "The original Steimer application was filed February 12, 1910, but the patent did not issue until December 8, 1925. In 1918 Steimer died, and some time prior to 1920 the plaintiff purchased the Steimer application. On February 4, 1920, plaintiff filed an amended application, and contemporaneously therewith or shortly thereafter added the claims in suit. Up to that time there was no disclosure in Steimer of a purpose to claim suspended gob feeding or severing in suspension. Steimer's concept, as evidenced by the claims filed prior to the plaintiff's purchase of the application, was to utilize the plunger as a stopper to close the orifice in the bottom of the chamber. This was shown, not only by the original claims, but also by the original specifications, which repeatedly characterized the plunger as a 'stopper' or 'interrupter stopper.'"

In Chicago & N. W. R. Co. v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053, it was held that amendments embracing any material variation from the original application—anything new, not comprised in that—cannot be sustained on the original application, and should not be allowed; otherwise, great injustice might be done to others who may have invented or used the same things in the meantime. The court said: "The law does not permit such enlargements of an original specification,

which would interfere with other inventors who have entered the field in the mean time, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the mean time, gone into public use."

█ The method disclosed by Steimer of separating the gob or mass from the outlet is by the application of a flame instead of shears. The whole process employed by Steimer is so radically different in every detail that it cannot be held to be antici- pated by Hitchcock. The theory of the Patent Office that the Hitchcock patent discloses a gob feeding and not a stream feeding device, and that the drops are sev- ered while in suspension, is a conclusion that cannot be deduced from the claims, drawings, or specifications of Hitchcock. Hitchcock's invention is purely a pouring device, while Steimer does disclose a means through which the gob or drop is severed from the mass at the outlet while it is suspended.

We will now consider appeal No. 6546, involving Steimer's application No. 65,185, filed October 27, 1925, as a division of the original Steimer application involved in appeal No. 6,545 which we have just dis- cussed. The sole claim relied upon reads as follows: "3. The combination with a feeder having a submerged delivery orifice delivering freely falling charges of glass, of a receptacle located to one side of the vertical passing through the orifice, and an inclined chute located below the orifice a distance greater than the length of the charge to receive charges falling from the orifice and to convey the same to the re- ceptacle, the chute at the point it receives the charge being sharply inclined to the line of fall of said charge to prevent de- formation of the latter."

The claim is for a combination of structural elements for producing freely falling charges of glass, that is, charges which are accumulated and separated be- fore being received in any receptacle; and for conveying each of such charges to a receptacle located below and out of line with the delivery orifice of the feeder by such means and in such a manner that, as the path of the fall of the charge is changed from the vertical to an inclined direction, the charge will not be harm- fully distorted by its contact with the con- veying means.

The Examiner rejected the claim on Brookfield, No. 883,779, in view of May, No. 596,897; the Board of Appeals, how- ever, did not base its rejection on Brook- field and May, but held the claim to be un- patentable over Hitchcock, No. 805,068, in view of Mansfield, No. 854,511. The court below in its memorandum opinion "agreed with the decision of the Board of Ap- peals," based on Hitchcock and Mansfield, but the court in its conclusions of law held the claim not patentably distinguishable "from the disclosure of the Brookfield patent." Although the Commissioner cited the May patent in his answer below, on this appeal that patent is not relied upon nor in the record; and in his brief the Commissioner urges that the Board was right in rejecting the claim on Hitchcock and Mansfield.

Brookfield feeds molten glass into a ro- tating receiver, and provides "a scraper adapted to make contact with the edges of the dished surfaces, as the receiver ro- tates, to hold back any excess of molten glass." In his specification he states that "this scraper is so arranged that it will press against such edge and push or scrape the molten glass that may have fallen upon it back on to the next dished surface 29." It thus appears that the thread or tail of glass that "may have fallen" on the edge of the dished surface or the receiver is scraped off after the glass of the charge is supported on the receiver. The molten glass from the receiver is emptied into a trough directly beneath and almost con- tiguous to the rotating receiver which de- livers it to the molds. Obviously, Brook- field does not disclose a feeder delivering freely falling charges as specified in the claim before us.

Hitchcock, as we have pointed out above, does not form glass in suspended gobs, and discloses no chute.

Mansfield by the use of rollers with grooves feeds the glass in a "rope-like shape" to a trough, the outer end of the trough forming "a portion of the shear mechanism for cutting off the desired quantity of glass," and a rotating disk with a beveled edge forming the other member of the shear mechanism. The severed

glass "drops over onto an inclined chute" located in close proximity to the cutting edge of the trough, and slides down the chute to the glass shaping mechanism. It is clear that Mansfield does not disclose "a feeder having a submerged delivery orifice delivering freely falling charges of glass," as specified in claim 3 of this appeal.

 In our view, since none of these references discloses the vital element of the claim, namely a feeder delivering freely falling charges of glass, and as the references do not teach or disclose the combination of the claim or the combined function or result thereof, appellant is entitled to the patent sought.

The decrees are reversed.