### KELLEY et al. v. COE, Com'r of Patents.
### No. 6973.

United States Court of Appeals for the District of Columbia.

Decided Sept. 19, 1938.

John Boyle, Jr., of Washington, D. C., and George F. Scull, of New York City, for appellants.

R. F. Whitehead, Solicitor, United States Patent Office, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

. MILLER, Associate Justice.

On January 13, 1933, appellant George S. Kelley filed with the Commissioner of Patents an application for a patent upon claims involving new and useful improvements in methods of dust removal. The twenty-one claims of the application were rejected by the Examiner on the ground that they showed no invention over the prior art. The Board of Appeals affirmed the Examiner's rejection. Two petitions for rehearing were filed before the Board; the first was denied and the second was dismissed. Kelley and Kadco Corporation—a successor in interest—thereupon commenced

suit in the lower court under Section 4915, R.S., 35 U.S.C.A. § 63. This appeal is from a decree dismissing the bill.

At the trial appellants withdrew all claims except 31, 37 and 44. These are the only claims involved on this appeal and are set out in the margin.[1] They relate exclusively to the method or process involved, not to machinery or apparatus.

The references relied upon by the Patent Office were: Prellwitz, No. 1,023,594, April 16, 1912; Ayotte, No. 1,334,430, March 23, 1920; Griffiths (British), No. 7355, March 27, 1906; Korfmann (German), No. 382,-007, April 30, 1924; Heldt (German), No. 235,522, June 12, 1911; Fraser (British), No. 100,817, January 6, 1916; German Patent No. 195,964, February 29, 1908. It was not found by the tribunals of the Patent Office, nor is it contended by the Commissioner in this court, that any one of the references relied upon constituted an anticipation of the Kelley method. Nor is it contended that any of the references relied upon were successful in operation. But it is contended that they, as the prior art, taught sufficiently well to prevent Kelley's method from constituting invention.

In rejecting the Kelley application, the Examiner said: "The prior art is full of

[1] "31. The method of rock drilling which comprises drilling a hole, injecting a current of air at the bottom of said hole during the drilling operation and simultaneously projecting a column of air laden with dust and cuttings from the drilling operation outwardly of said hole, locating the mouth of an air-guiding hood in line with the axis of the hole, continuously maintaining the interior of the hood in free and open communication simultaneously with the hole and with the outside air for the entry of outside air into the hood at all times during the drilling operation, continuously drawing clean outside air and dust-laden air from said hole simultaneously into said hood, the clean outside air in greater volume per unit of time than that of the dust-laden air delivered from said hole into said hood per unit of time by establishing currents of outside air flowing inwardly to said column from all sides of the column and into said hood and between said hole and the mouth of said hood, and laterally confining and enveloping the dust-laden air column between said hole and hood by said inwardly flowing currents of outside air, and continuously maintaining negative pressure in said hood during receipt of said dust-laden column, and continuously sucking dust-laden air from said hood."

"37. The method of rock drilling which comprises drilling a hole, injecting a current of air at the bottom of said hole during the drilling operation and simultaneously projecting a column of air laden with dust and cuttings from the drilling operation outwardly of said hole, locating the mouth of an air-guiding hood in line with the axis of the hole, continuously maintaining the interior of the hood in free and open communication simultaneously with the hole and with the outside air for the entry of outside air into the hood at all times during the drilling operation, continuously drawing clean outside air and dust-laden air from said hole simultaneously into said hood, the clean outside air in greater volume per unit of time than that of the dust-laden air delivered from said hole into said hood per unit of time, and thereby greatly reducing the dust content in the hood per unit volume of air as compared with the dust content per unit volume of air discharged from the hole, and continuously sucking from the hood a greater volume of air per unit of time than that injected into said hole per unit of time and thereby maintaining negative pressure in said hood and accelerating the movement of air from the hole into the hood."

"44. The method of facilitating rock drilling where air is projected under pressure into the hole to blow the dust therefrom, which comprises reducing considerably the back pressure at the bottom of the hole, greatly increasing the velocity of the air introduced into the hole over that resulting from the pressure which projects it into the hole, continuously displacing the larger cuttings produced by the drill from the bottom of the hole and from the path of the drill, entraining said larger particles in the accelerated air stream leaving the hole, removing said particles from the hole together with any dust produced by the drill, providing an air guiding hood at the mouth of the hole and in line with the axis thereof, continuously maintaining the interior of said hood in free and open communication simultaneously with said hole and with the outside air, preventing expansion into the atmosphere of the dust-laden air leaving the hole by indrawing it into said hood together with an encircling column of outside air, substantially reducing the velocity head of the dust-laden air within said hood by indrawing into it a larger quantity per unit of time of oppositely directed outside air, and continuously removing the mixed dust-laden and outside air from said hood."

patented devices which have recognized the advantages of allowing outside air to flow into the hood to mix with the dust ladened air which comes out of the bore hole." And further he said—after describing several of the references relied upon—"In each of the above patented devices a suction means is used to evacuate the dust hood and maintain the inside of the hood at a lower pressure than the pressure of the outside air."

The Board of Appeals said, in affirming the action of the Examiner: "The claims * * * are all directed to a method but when reduced to its simplest form, the method claimed involves, over that inherent in the use of prior art devices, largely a difference in the degree of rarefaction to which the dust-collecting hood is subjected." And in his brief on appeal to this court the Commissioner said:

"It was not new, as shown by a number of the references of record, and as stated by the court below in its findings of fact, to use a fan, or blower, or suction pump, in connection with mechanism designed to remove the dust created in rock drilling, and the patent to Prellwitz shows a device which is intended for exactly the same use as the Kelley device."

While it is true that at first glance Kelley's method may seem to be merely an advance in degree over the prior art, nevertheless, we are of the opinion that the extreme and well-recognized need for an effective method of dust control, the prior but unsuccessful attempts of others over a period of years, and finally, Kelley's success where all others had failed, constitute persuasive evidence of invention.

For many years rock drills, driven by compressed air, have been utilized extensively for drilling in mines, in quarries, for foundations of buildings, and for numerous other industrial purposes. The drill consists of a pneumatic hammer mounted upon a supporting base, which strikes about two thousand times a minute against one end of a bit or drill steel, the other end of which cuts and shatters the rock into dust and small particles. The drill bit is constructed of steel and is slightly hollow, a small hole extending throughout its length. Air is forced into the upper end of this hole and is carried by pressure to the point of drilling. In this way, the dust and small particles of rock are blown from the excavation into the surrounding atmosphere, enveloping the operator of the drill in a cloud of dust. In most localities the dust thus generated by the drills contains silicon in the form of silicon dioxide or quartz, which, if inhaled in sufficient quantities over a period of time, produces a disease known as silicosis. As a consequence, silicosis is very common among drill operators, and in many cases results in a fatal form of tuberculosis. This health peril, known as early as 1900, created an acute need in the rock-drilling industry for a method of controlling the dust. In the United States, as in other countries, the oldest and principal method of dust control —and the only successful one prior to the Kelley process—is known as wet drilling, i. e., forcing water, or a mixture of air and water, through the hollow drill steel into the hole being drilled, or directing a jet of air and water at the face of the hole as the dust emerges. This method, however, has not been entirely satisfactory because of the inefficiency of operation, and because the method creates unhealthy and unpleasant working conditions, e. g., in deep mining, the addition of the water tends to increase the humidity; in outdoor work, the water is likely to freeze in cold weather; and, generally, the drill workers are adversely affected by the dampness and wet footing caused by the presence of the continuous spray. Moreover, wet drilling fails to eliminate the dust completely.[2]

Appellants' claimed invention relates to a method of eliminating dust by maintaining at all times a sub-atmospheric pressure or vacuum over the mouth of the hole being drilled. Appellants' method accomplishes this result by enclosing the mouth of the drill hole with a casing or hood, to which is connected a powerful fan blower which exhausts from the hood a much greater volume of air per unit of time than is projected into the hole through the hollow drill steel. About five to seven times as much air is thus drawn from the hood through the exhaust as goes into it through the drill steel. At the top of the hood is an aperture through which the drill steel extends. It is essential that this opening be larger in diameter than the drill steel, in order that outside air in substantial quantities may be drawn into the hood. For the same reason, it is essential that the mouth of the hood be spaced at a slight distance from the face of the rock, so that an opening will exist between the hood and the surface. Thus, when the drill and the blower are in opera-

---

[2] Drinker and Hatch, Industrial Dust (1936) 173 et seq.

tion, air is drawn into the hood at all openings and withdrawn at the exhaust.

The air coming in between the rock face and the hood prevents dust from being blown out around the sides as it otherwise would. With the air entering in this manner the hood is not actually touched by the dust which is coming up from the drill hole, because the air drawn in from the sides makes a curtain surrounding the dust as it comes up and directs it into the exhaust line outlet. Similarly, the incoming air at the top of the hood breaks the velocity of the upcoming dust and chips, and, joining with the incoming air from the sides, makes them turn the corner and flow through the suction outlet of the exhaust line. The sub-atmospheric pressure thus creates an air seal around these openings, rendering escape of dust impossible. The air-flow which results from operation of appellants' process producing the desired elimination of dust is illustrated by the drawing reproduced below, which was introduced by appellants as Plaintiff's Exhibit 4 in the lower court:

PLAINTIFF'S EXHIBIT 4

The manner of operation of the Kelley process is illustrated by the drawing reproduced below, which was also introduced by appellants as Plaintiff's Exhibit 3 in the lower court. (Page 439) A guide to the important letters is set out in the margin.

The successful operation of Kelley's process and proof of his claims were both clearly established by the evidence; which was unchallenged by the Commissioner except by his offer in evidence of the references upon which rejection was based. Consequently, in determining whether Kelley achieved invention we start with the fact that he has made a distinct and valuable contribution to the art. This the Commissioner concedes when, in his brief, he states "* * * nor is it contended that the device is not useful. No such suggestion was made in the Patent Office and the testimony presented in the lower court shows that the method has gone into quite extensive use."

The use of the Kelley method has produced highly satisfactory results not only in downward vertical drilling but in overhead vertical drilling. The evidence proved that the method is so effective in actual operation that no dust escapes from the hole; and that judged by the hygienic standard the results are more than satisfactory, that is, the air is cleaner with the Kelley method in operation than is necessary for the requirements of hygiene. In recognition of his success in devising a method of controlling silicosis, Kelley received the John Scott Medal from the Board of Directors of the City of Philadelphia, and a certificate of merit from the Franklin Institute.

In addition to conserving the comfort and health of the workers by preventing the escape of dust, appellants' method has great utility in reducing the cost of drilling, by increasing speed and efficiency. In the use of the Kelley process the velocity of air within the drill hole is so great that all cuttings are forced from the cavity into the hood, and the bottom of the hole is kept clean. As a result, the drill steel is always cutting virgin rock rather than grinding large chips into smaller ones, as is the case where the Kelley method is not used. In addition, the steel drill point remains sharp for a longer period of time, dispensing with the former need for frequent sharpening. Moreover, the need is removed for cleaning out drill holes before planting dynamite, where they are to be used for that purpose. Experiments demonstrated that by using the Kelley method an increase of forty per cent in actual drilling speed is achieved, and, in over-all speed, there is a saving of twenty per cent, as contrasted with other types of drilling generally in use. The cost of drill-

PLAINTIFF'S EXHIBIT 3

C—Drilling surface
D—Pneumatic rock drill
E—Tripod supporting drill
F—Drill steel or bit
G—Hood
L—Flexible hose or conduit for
 removal of dust and cuttings
O—Pump or blower
P—Motor providing power for pump or blower
R—Separator tank, depository for debris
W—Opening for removal of debris
Y—Inlet opening
Z—Pipe or header, carrying a manifold, b, to which
 is attached flexible conduit L

ing by the Kelley method is also considerably less even though the cost of the additional equipment is included in the cost basis.[3]

The dust hazard in rock drilling was recognized by drilling engineers many years ago, and after the turn of the century patents were granted from time to time for methods of controlling dust produced in dry rock drilling. As a reason for his invention, Prellwitz stated in his application, filed in 1907, that the "dust and chips blown from the hole make it unhealthy and annoying to the operator of the drill as the operator must necessarily inhale the dust to a greater or lesser extent." The German patent to Heldt, of 1911, refers to the dust as "annoying and injurious to health," and in 1919, Ayotte stated that the principal object of his invention was "to provide means for collecting the dust and particles of material created by the drill so as to prevent the same from mingling with the air of the mine and thus affecting the health of the miners." For approximately thirty years, therefore, scientists the world over recognized an urgent need in the dry rock-drilling industry—discovery of a method for eradication of the cause of silicosis—and attempted to meet that need. That they failed is obvious from the fact that, prior to the discovery of Kelley's method, the only practical method devised, and the only one used by mine operators, was that of wet drilling, which, at its best, was highly unsatisfactory.

The use of suction methods for ventilation and dust removal by means of industrial and household vacuum cleaners has long been known. The possible applicability of such methods to dust removal in rock-drilling operations seems obvious. But, although a number of experimenters attempted to achieve the desired result, the important fact is that none of them succeeded. Their proposals were tried out and rejected by the industry. They never passed beyond the theoretical or experimental stage. Prior to Kelley's discovery, and in spite of the series of patents theretofore granted, the industrial practice was either to suffer the dust or to use wet drilling. His method was the

---

 3 Kelley testified: "We sell the apparatus with a distinct guarantee that we will not increase the cost of production. By that I mean that the depreciation, interest on investment, cost of operation, extra cost, are included and charged up against the methods of dust control. We never have had to make good on any of these guarantees. I also sell the equipment with a written guarantee to control the dust within safe hygienic limits as specified by any recognized authority."

first achievement of dustless, dry drilling and it was a complete success, hygienically, as well as from the point of view of economic efficiency. This seems to make the classical picture of an invention.[4]

The fact that Kelley's method may seem simple in its operation does not disprove invention.[5] The difference between it and the prior art may not be great in a physical sense, but slight as it may seem to be it was sufficient to achieve success where success had never before been achieved. It was not merely one step in a developmental process, but was the one step from failure to success. As was said in The Barbed Wire Patent, 143 U.S. 275, 282-283, 12 S.Ct. 443, 446, 36 L.Ed. 154:

"Under such circumstances courts have not been reluctant to sustain a patent to the man who has taken the final step which has turned a failure into a success. In the law of patents it is the last step that wins. * * * There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of a series of inventors, all of whom were groping to attain a certain result, which only the last one of the number seemed able to grasp."

In his brief on this appeal the Commissioner relies particularly upon the Prellwitz patent and says:

"The ground of rejection is that it would not have required invention to change the apparatus in the patent to Prellwitz, No. 1023594 (R. p. 121), by substituting a blower, or suction pump, for the ejector shown in the Prellwitz apparatus, as the means for sucking air out of the hole being drilled."

The Examiner, in rejecting Kelley's claims, said: "The operation of Prellwitz's device and applicant's device are exactly the same. * * *" This is a splendid example of that type of reasoning which assumes, because it is easy to follow a blazed trail, that it is also easy to make one.[6] What actually happened, when attempts were made to operate the Prellwitz device in accordance with the teaching of the prior art, was described by one of the witnesses as follows:

"* * * the Prellwitz device was a complete failure and did not operate either to permit the complete drilling of a hole or to eliminate dust. On the contrary, the hole became so choked with cuttings that the drill became jammed. So long as the drill still moved, great quantities of dust were blown into the outer air, not only from the hood, but from the point between the hood and the face of the rock being drilled."

Although the Prellwitz patent was issued in 1912 it was never a success, nor anything more than a paper patent. Prellwitz himself admitted that it was a failure.[7] The

---

4 Patent Royalties Corp. v. Land O'Lakes Creameries, 2 Cir., 89 F.2d 624, 627; In re Coykendall, 58 App.D.C. 280, 29 F.2d 868.

5 United Shoe Machinery Corp. v. Ferree Co., 2 Cir., 64 F.2d 101, certiorari dismissed, 290 U.S. 708, 54 S.Ct. 129, 78 L.Ed. 608. In Potts & Co. v. Creager, 155 U.S. 597, 608, 15 S.Ct. 194, 199, 39 L.Ed. 275, the Court said: "The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before. The practiced eye of an ordinary mechanic may be safely trusted to see what ought to be apparent to every one." In Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, the Court said: "* * * it is plain, from the evidence and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but

they certainly failed to see it, to estimate its value, and to bring it into notice. * * * Now that it has succeeded, it may seem very plain to any one, that he could have done it as well. This is often the case with inventions of the greatest merit." See, also, Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034; Krementz v. S. Cottle Co., 148 U.S. 556, 560, 13 S.Ct. 719, 37 L.Ed. 558; Du Bois v. Kirk, 158 U.S. 58, 63, 15 S.Ct. 729, 39 L.Ed. 895; General Electric Co. v. Hill-Wright Electric Co., 2 Cir., 174 F. 996, 998; Brick v. Namm & Sons, D.C.E.D.N.Y., 22 F.2d 693, 695, affirmed, 2 Cir., 22 F.2d 697.

6 In re Henry, 55 App.D.C. 396, 6 F.2d 699; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 484-435, 31 S.Ct. 444, 55 L.Ed. 527; In re Huff, 48 App.D.C. 258, 263; Hartford-Empire Co. v. Coe, 66 Ap.D.C. 344, 347, 87 F.2d 741, 744.

7 "If it had been a success, he would hardly have thrown it aside permanently. * * * His efforts in that direction must be relegated to the class of unsuccessful and abandoned experiments,

importance of this lack of utility for such a long period of time is emphasized and magnified by the fact that Prellwitz was an engineer of recognized ability in the art, employed by one of the largest manufacturers of mining machinery in the world. Moreover, this company maintained a corps of engineers whose duty it was to design improvements in drilling devices, such as Prellwitz was seeking. Yet, with all this at his disposal, Prellwitz was unable to do that which the Patent Office says any mechanic could do.[8]

Although some of the references provided for removal of dust by suction, none of them recognized or stated that it was necessary to use suction or to maintain a negative or sub-atmospheric pressure in the hood at all times during operation. In fact, so far as the teaching of the prior art was concerned, the result could as well be accomplished by ejecting or forcing the air and dust out through the exhaust, as described by Prellwitz.

Although other references described hoods with apertures which permitted ingress of air at the top and bottom thereof in addition to the air which was forced through the hole in the drill steel, none of them recognized the necessity for permitting free entry of air at these points, under conditions of sub-atmospheric pressure in the hood, in order to provide a curtain or seal of incoming air to prevent escape of dust. Instead, they proceeded on the theory that the hood should be physically sealed by making the apertures as small as possible. Their attempt to achieve a physical sealing in this manner worked directly at odds with the correct theory, as later discovered by Kelley.

And in none of the references is there taught, nor do all of them together reveal, the necessity for coordination of the various steps in harmonious interaction as shown by Kelley. As was explained by witness Drinker: "It has to be a coordinated whole. You can divide it up theoretically into parts, but in actual operation you cannot distinguish them for they are coordinated as one unit when it is done." Kelley was the first to conceive the idea and to describe the method for putting the elements together into a unit which functioned successfully.[9]

 Kelley himself first worked on the theory of the prior art and failed. It was only when he used the particular combination described in his claims that he succeeded. And it was not until the theory of operation described in Kelley's method was understood by those who had failed in their efforts to use the Prellwitz method in the light of the prior art, that they realized the fundamental defect of the Prellwitz method and the reason for its failure.[10] In order that a reference or group of references may teach a process, the process must be deliberate and the means understood.[11]

which, as we have repeatedly held, do not affect the validity of a subsequent patent." Deering v. Winona Harvester Works, 155 U.S. 286, 301–302, 15 S.Ct. 118, 124, 39 L.Ed. 153.

[8] See Krementz v. S. Cottle Co., 148 U.S. 556, 560, 13 S.Ct. 719, 37 L.Ed. 558; Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 423, 424–425, 22 S.Ct. 698, 46 L.Ed. 968; In re Walch, Cust. & Pat. App., 87 F.2d 511.

[9] See In re Coykendall, 58 App.D.C. 280, 29 F.2d 868; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 58–60, 43 S.Ct. 322, 326, 327, 67 L.Ed. 523; Hobbs v. Beach, 180 U.S. 383, 393, 21 S.Ct. 409, 45 L.Ed. 586; In re Henry, 55 App.D.C. 396, 397, 6 F.2d 699, 700; In re Davidson, 56 App.D.C. 279, 281, 12 F.2d 814, 816.

[10] See Miehle Printing Press & Mfg. Co. v. Whitlock Printing Press & Mfg. Co., 2 Cir., 223 F. 647, 650; Gasoline Products Co. v. Coe, 66 App.D.C. 333, 339, 87 F.2d 550, 556.

[11] See H. K. Regar & Sons v. Scott & Williams, 2 Cir., 63 F.2d 229, 231. See

Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 58–60, 66, 43 S.Ct. 322, 326, 327, 329, 67 L.Ed. 523; Minerals Separation v. Butte & Superior Min. Co., 250 U.S. 336, 348–349, 39 S.Ct. 496, 63 L.Ed. 1019; In re Moulton, 40 App.D.C. 160.

A process is a mode, method, or operation, whereby a result or effect is produced. Corning v. Burden, 15 How. 252, 14 L.Ed. 683. "A patentable process is a method of treatment of certain materials to produce a particular result or product." Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 255, 48 S.Ct. 474, 478, 72 L.Ed. 868. See, also, The Telephone Cases, 126 U.S. 1, 533, 8 S.Ct. 778, 31 L.Ed. 863; Cochrane v. Deener, 94 U.S. 780, 788, 24 L.Ed. 139; Tilghman v. Proctor, 102 U.S. 707, 728, 26 L.Ed. 279; Expanded Metal Co. v. Bradford, 214 U.S. 366, 385, 29 S.Ct. 652, 53 L.Ed. 1034.

"A process patent * * * is not anticipated by mechanism which might with slight alterations have been adapted to carry out that process, unless, at least,

The following language of Wach v. Coe, 64 App.D.C. 235, 236, 237, 77 F.2d 113, 114, 115, is strikingly applicable to the situation of the present case:

"For almost a quarter of a century following the Parsons invention efforts were made by leading marine engineers of the world to connect the engine and turbine to the same propellor shaft, but without success.

\* \* \* \* \* \*

"It thus appears that the best marine engineers in the world, with unlimited means at their command, failed to solve the problem, the solution of which the tribunals of the Patent Office and the court below have ruled to be obvious to any one skilled in the art.

\* \* \* \* \* \*

"Where, as here, the new device is also useful and marks a distinct and novel advance in the art, it should receive patent protection. For almost 25 years, as we have seen, patents have been granted in this art on devices that proved to be practically worthless, and yet appellant has been refused a patent on his successful device because the Patent Office has found that, by taking this and that from the unsuccessful patents, the result achieved by appellant could have been accomplished."

■ The Commissioner's argument in the present case comes down to the same result. He contends that anyone skilled in the art could have taken this and that from the various patents and, putting them together, could have devised the Kelley method.[12] But the fact remains that, in the face of a crying need for a new process or method in the industry, not one of the best engineers in the world, with their attention especially directed to the subject for approximately thirty years, was able to see what Kelley saw, or to produce the result which he produced.[13] The evidence in support of appellants' application establishes beyond doubt their right to the issuance of a patent.

The decree of the lower court is reversed and the cause remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

EDGERTON, Associate Justice (dissenting).

It seems to me doubtful whether or not the Supreme Court's present strict standards of invention are met here. If the case involved the validity of an issued patent, the presumption that the Patent Office is right until it is shown to be clearly wrong would control, and I should vote to sustain the patent. That was the question in all of the cases, except one from the Court of Customs and Patent Appeals,[1] which the prevailing opinion cites from other courts than our own. In the present case the Patent Office has rejected the application for a patent; and the District Court has upheld

---

such use of it would have occurred to one whose duty it was to take practical use of the mechanism described." Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 424, 22 S.Ct. 698, 707, 46 L. Ed. 968.

"The disclosure of a foreign patent is to be measured not by what may be made out of it, but what is clearly and definitely expressed in it." Davies v. Coe, 65 App.D.C. 345, 346, 83 F.2d 602, 603; Becket v. Coe, 69 App.D.C. 53, 98 F.2d 332.

[12] "The line between the skilled mechanic and the ingenuity of the inventor cannot be accurately drawn in any given case, but where a demand has long existed, and men skilled in the art have sought to meet that demand without success, the argument that the methods employed by the inventor who has solved the problem are so obvious as to involve only mechanical skill, is not entitled to very serious consideration" (Inland Mfg. Co. v. American Wood Rim Co., 6 Cir.,

14 F.2d 657, 659) for "mere skill of the art would normally have been called into action by the generally known want." Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S. Ct. 449, 454, 79 L.Ed. 997. See, also, Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 68, 43 S. Ct. 322, 330, 67 L.Ed. 523; Tyra v. Adler, 8 Cir., 85 F.2d 548, 552; Cambridge Trust Co. v. Coe, 66 App.D.C. 326, 328, 87 F.2d 543, 545; Gasoline Products Co. v. Coe, 66 App.D.C. 333, 339, 87 F.2d 550, 556; Patent Royalties Corp. v. Land O'Lakes Creameries, 2 Cir., 89 F.2d 624, 627; Iron Fireman Mfg. Co. v. Industrial Engineering Corp., 7 Cir., 89 F.2d 904, 909; George Frost Co. v. Cohn, 2 Cir., 119 F. 505, 508.

[13] See Krementz v. S. Cottle Co., 148 U.S. 556, 560, 13 S.Ct. 719, 37 L.Ed. 558; Lucke v. Coe, 63 App.D.C. 61, 65, 69 F.2d 379, 383; In re Glafcke, 51 App. D.C. 204, 206, 277 F. 603, 605.

[1] In re Walch, 87 F.2d 511.

its action. I think the presumption that the Patent Office and the District Court are right until they are shown to be clearly wrong applies here. I therefore think the decree dismissing the bill should be affirmed