**HOLED–TITE PACKING, Inc., v. MAPES et al.**

(District Court, S. D. New York. March 9, 1925.)

No. 1035.

**1. Patents ⚖328.**

Koppelman and Cooper patent, No. 1,429,- 207, claims 1–6, 8–10, covering device for packing eggs, *held* valid and infringed.

**2. Patents ⚖328.**

Miller patent, No. 1,026,359, covering device for packing eggs, *held* not infringed.

In Equity. Suit by the Holed-Tite Packing, Inc., against Winfield H. Mapes and others. Decree for plaintiff, and defendants' counterclaim dismissed.

Stephen J. Cox, of New York City (Charles Neave, of New York City, of counsel), for complainant.

John D. Morgan, of New York City, for defendants.

AUGUSTUS N. HAND, District Judge. This is a suit to restrain the alleged infringement of United States patent No. 1,429,207 to Koppelman and Cooper. The defendant Winfield H. Mapes Company not only denies invention and infringement, but counterclaims for alleged infringement of United States patent No. 1,026,359 to Miller, under which it purports to manufacture its device. [1, 2] The patent in suit relates to an improved device for packing eggs. The article which both complainant and the Winfield H. Mapes Company have put on the market has met with a very large commercial success, and probably more than any other has substantially saved the breakage of eggs in transportation. The defendants only claimed to be prior inventors on the eve of trial, and they have not met the burden requisite to prove such a defense. The patentees had conceived the invention in February, 1921, and through Arminger made a flat embodying the device illustrated in the patent in suit before they had anything to do with the defendants. The letter of November 1, 1921, is persuasive evidence that Arminger recognized that he was working for Mann, who was a partner of Koppelman, and had no thought that he was himself an inventor.

The case really comes down to the question whether the Miller patent, No. 1,026,359, precludes invention, or so narrows the claims of the patent in suit as to avoid infringement. I think it reasonably clear that the Miller patent furnishes no defense on either ground. That patent contains drawings resembling the patent in suit, but, when the specification is carefully read, essential resemblance is lacking. The Miller patent does not contemplate a blank made by the pulp-sucking process, but says:

"* * * The cardboard blank or member *1* is suitably passed between specially devised rollers, * * * and has impressed or rolled therein, at or during its initial passage, numerous circular upraised or embossed-like formations or corrugations *2*. These latter are produced at suitable intervals apart, say about an inch and three-fourths, the same ranging in either direction along the blank or member *1*, and projected about half an inch or more, as practical use may suggest. The blank or member *1* has impressed or rolled therein, during a second passage thereof between the rolls, depressions, or cavities *3*, a cavity or depression indenting each elevation or corrugation *2* just centrally thereof, as clearly disclosed especially in Fig. 2, the depressions or cavities being adapted to conform to and receive the eggs endwise, as also seen in this figure for their suitable retention individually in such position when placed or inserted within the cells of the filler *4*, the filler of the standard or ordinary form being available for use in this connection, or a filler of any preferred or approved form may be employed as desired. * * *"

The second claim calls for "yieldable material." While the pulp-sucking process was old in the art, it cannot be said to have been within the contemplation of Miller, who described an embossed process which could hardly have formed a rigid support for the egg. While Miller intended something in advance of the Gill cup, he indicated no purpose to employ a flat moulded by the pulp-sucking process, or any understanding of more than a cardboard holder pressed out so as to conform to his drawings.

It is argued that the patent in suit nowhere defines the terms relatively rigid. At lines 13–37, on page 2, we find the words:

"* * * The holders are of such form and are so constructed and arranged as to hold the eggs or other articles securely, and to lock the cell walls or 'fillers' against all lateral movement, while at the same time they are only relatively rigid, and will have a sufficient degree of elasticity to accommodate themselves to slight variations in the sizes of the eggs or other articles, without cracking or checking them, or permitting such injury under the most severe shocks and strains of shipment and handling. Moreover, the nature of the construction insures proper and accurate form, and the preservation of that form in use, since any pressure on the unit

or any part thereof will tend to move its fibers from their normal position, and will be constantly resisted thereby, to the end that the parts will always have a tendency to return to their original form, which causes them to exert a counter pressure when slightly pressed or drawn therefrom, and to hold the articles in a firm but only relatively rigid grip."

And at page 2, lines 53–58:

"This is largely due to the fact that the holders are preformed, so that the flat and its holders thereon maintain their form, even after the innumerable shocks and vibrations of a long railroad journey, cartage, and handling."

In other words, the relative rigidity is sufficient, so that the cups do not deform when the eggs are packed in them, and so that they retain their form, even after shocks and vibrations of transportation and handling.

To be sure, no mathematical formula based upon the physical properties of an exhibit of a given thickness and texture, is furnished, but the specification teaches (page 1, line 94) that the material should be made by the pulp-sucking process, and that it should be rigid enough not to deform under shocks which may be reasonably anticipated, and that it shall be of a certain shape and design.

There is no suggestion in the Miller patent of a rigid structure. That patent was granted about 13 years ago, and no one apparently ever regarded it as a practical solution of anything until the defendants wished to use commercially the structure devised by Koppelman & Cooper.

The Miller patent nowhere indicates that the egg is to be supported by a line contact with a cup having relatively rigid walls like the patent in suit. Indeed, the entire specification and diagrams show an egg inserted and held, both at the top and the bottom, in a cup wherein it might readily move.

Moreover, in the Miller patent the upper cushion is "placed upon the upper ends of the eggs, pressure then being applied to the cushion-forming member, for forcing the eggs downwardly until the cushion forming member is in contact with the upper edge of the filler." Specification, p. 2, lines 17–22.

This process contemplates not only pressure in inserting the flat in the filler, but also contemplates bringing the ends of the eggs up to the cardboard, so there is no space for play in case of a vertical shock, and the weight of the eggs above is borne by the eggs below, rather than supported by the arch of relatively rigid paper fiber, as in the patent in suit.

The patent in suit has a device which embodies an arch of great comparative strength, a wedge contact between the egg and the cup of a relatively rigid fibrous material, and normally an absence of contact between the upper ends of the eggs and the downwardly inclined interior part. There is consequently not a mere enveloping of the ends of the eggs, as disclosed in the Gill holder, but a method of maintaining the eggs in a fixed position, which will keep them from rolling against the sides of the filler, with consequent likelihood of damage to both. The arch construction gives the structure great strength, and the absence of contract between the upper end of the egg and the interior portion of the filler above greatly lessens the damage from vertical shocks.

Much is sought to be made by the defendants of the statement of the specification that "each holder consists of an upwardly and inwardly inclined ring 4 and a downwardly and inwardly inclined interior wall 5, with an approximately *horizontal* bottom and central portion 6. * * *" It is contended that a horizontal bottom has edges which injure the eggs, and is an impracticable device, and is used neither by the complainant nor the defendant company. It may be observed that the specification goes on to say that "the angles and arrangement of these members may be varied to some extent." The diagram of the patent shows a concave-convex bottom. This bottom, which is intended to give reinforcement to the structure, should not by proof of impairment of function in a structure once used by complainant, but not required by the patent, destroy a valuable invention.

The counterclaim is, I think, without merit. I have attempted to indicate the wide differences between the patent in suit and the Miller patent. It is said complainant infringes the Miller patent, because it puts a flat at the bottom of the case of eggs upside down, and puts another flat on top to hold the eggs. The bottom flat is mere packing, not fastened to the one above it, and holds no eggs. I cannot see the least ground for supposed infringement.

The specification states that a ring contact is preferred and most of the claims call for it, but it adds: "Nevertheless the holders will serve their purpose, perhaps less efficiently, if the cuplike inside portion and the mouth or aperture are made large enough to permit the bottom of the article to rest normally upon the bottom of the cup without wedging."

I have some doubt about claims 5 and 6 that cover such broad features, in view of the

Miller patent and the Gill filler, and indeed the general prior art. Yet there would remain the feature of relatively rigid holders, which, unless the eggs were absolutely loose in them, would furnish a stable reinforced carrier for the eggs that would withstand shocks to an unusual degree.

The testimony shows a long attempt to secure an egg carrier, which would avoid expensive packing and reduce breakage to a very small proportion of the eggs transported. Many tried to devise one, but nothing anything like as efficient preceded the Koppelman and Cooper invention. It has met with a very great success. The patent to Miller was not cited in the Patent Office against Koppelman and Cooper, nothing so far as the record shows was ever made under it, and it seems to have never been thought of until the defendant Winfield H. Mapes Company secured it in the hope of controlling the market in egg carriers made under the patent in suit. I think it clear that it cannot affect complainant's rights.

An interlocutory decree is granted to complainant, holding claims 1, 2, 3, 4, 5, 6, 8, 9, and 10 of the patent in suit valid and infringed, and dismissing the counterclaim.