## PATENT ROYALTIES CORPORATION et al. v. LAND O'LAKES CREAMERIES, Inc., et al.

### No. 336.

Circuit Court of Appeals, Second Circuit.
April 12, 1937.

Stephen H. Philbin and Stephen J. Cox, both of New York City, for appellants.

William F. Hall, of Washington, D. C., and Robert S. Blair, of New York City (Ellis Spear, Jr., and Geo. B. Rawlings, both of Boston, Mass., of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree for the defendant in the usual suit in equity upon patent No. 1,429,207. In the court below the claims in suit were Nos. 1, 3, 4, 8, 9 and 10, but claim 10 has been abandoned on appeal. The patent was before Judge Augustus N. Hand in Holed-Tite Packing, Inc., v. Mapes (D.C.) 11 F.(2d) 787, when he held it valid and infringed; the defendant did not appeal. In the case at bar the district judge followed his ruling as to validity, but thought that the defendants did not infringe. On this appeal they argue that the claims do not cover their article, but that if they can be so construed, they are invalid. The patent was originally applied for on April 15, 1922; the application then including not only the patent in suit, but a "pulp-sucking" machine to make it. This application was divided out on July 17, 1922, and the patent issued September twelfth of the same year. The patent for the machine did not issue until March 6, 1928.

The invention is for packing any fragile articles, but it has been substantially confined to carrying eggs, for which many millions of sheets are sold yearly, and which are carried almost exclusively in this way. Long before 1922 it had been customary to pack eggs in wooden crates by means of "flats" and "fillers." A "flat" is a flat piece of cardboard or strawboard or the like of the same area as the crate; a "filler" consists of two series of parallel perpendicular strips of cardboard, at right angles to one another, forming rectangular cells, like a honeycomb. One egg is put in each cell, and held between an upper and a lower "flat." This method resulted in much breakage, which the patent in suit was designed to avoid. It used the old "fillers," but disclosed new "flats." the same at the top and at the bottom. Their surface was studded with "holders" registering with the cells of the "filler," so that each cell should have a "holder" above and below. The "holders" were truncated cones with a "downwardly inclined" inner wall sloping to "an approximately horizontal bottom"; that is, with a cupped inside. The egg rested upon the rim of the frustum like "the keystone of an arch" being wedged into it; the upper "holder" did not ordinarily touch it, but was ready to receive it if the crate were inverted. The "holders," top and bottom, also kept the perpendicular walls of the fillers in place against lateral movement. It was said to be important "that the opening at the top shall be large enough to receive either end of the egg * * * so the edges of the opening will engage the wall of the article at such an angle that there will be a degree of wedging action." (Page 2, lines 91–97.) "If however pressure is exerted in forcing the article therein so that the holder is spread to some extent no harm will be done, and the holder will grip the article because of the tendency of the holder to return to its normal 'shape." (Page 2, lines 102–107.) The "flats" might be made by the "pulp-sucking" process, described in the parent application, but that was not essential; it was essential, however, that they should be "only relatively rigid and will have a sufficient degree of elasticity to accommodate themselves to slight variations in the sizes of the eggs * * * without cracking or checking them, or permitting such injury under the most severe shocks and strains of shipment and handling." (Page 2, lines 18–25.) "Any pressure on the unit or any part thereof will tend to move its fibres from their normal position and will be constantly resisted thereby, to the end that the parts will always have a tendency to return to their original form, which causes them to exert a counter pressure when slightly pressed or drawn therefrom and to hold the articles in a firm but only relatively rigid grip." (Page 2, lines 28–37.) Claim 1, described the "flats" as having a "series of projecting holders each consisting of a round upstanding rim of substantially truncated conical form, an inwardly and downwardly interior part extending to a point near the base of said upstanding portion, and a central bottom portion, the downward inclination of the said inner portion being approximately tangential to the curve of the article to be placed therein, the space defined by the

edge formed by the junction of the upstanding portion and the interior portion being of lesser diameter than the greatest diameter of said article and adapted to hold the latter by contact therewith between its middle and its bottom." Claim 9 described the "flats" as "having relatively rigid holders * * * each of said holders being pre-formed with an aperture at its upper part and a cup-like member inside it of a size to receive the end portion of the egg * * * without material expansion or compression." The patented "flat" has always been made by the pulp-sucking process, which is practically essential for its success; if made otherwise the embossing of the "holder" strains the fibres so that they tend to return to their original position. The conical cups of the plaintiff's commercial "holders" are rigid enough to hold the egg against its weight and ordinary jars, but will yield to a large egg without cracking it. They differ from the figures of the patent only in that in the patent the inside of the cup is somewhat lower and has a nearly flat bottom. The supposed infringing "flat" is made likewise by the pulp-sucking process; the "holders" are not conical, but diamond-shaped parallelograms, the egg resting not upon any part of the edge, but upon four points of the inner walls, which are somewhat less perpendicular than those of the patent in suit. The opposite ends of the longer axis are pierced, so that the bottom of the egg will be ventilated. Like the plaintiff's commercial "holders," the defendant's yield under pressure of a large egg, but are sufficiently rigid to support its weight without bending. .

The art was full of egg holders of various sorts. The earlier in evidence was Stewart's, No. 640,600, issued January 2, 1900. The fillers were the same as to-day, but the "flat" was corrugated so as to cushion the egg, top and bottom. The next reference—the closest of all to the patent in suit—was Miller's patent, No. 1,026,359, issued on May 14, 1912. The "flats" were to all intents the same as the plaintiff's commercial article—a series of truncated cones with shallow interior cups. But they were to be glued together in pairs, back to back, each pair making a hollow enclosure, cupped, top and bottom; they were to be made of "suitable material preferably card or straw board of usual thickness" (page 1, lines 69–70); and were to act as compressible cushions. The specifications and especially figure three show that in use they were to be deformed: "A sec-

ond cushion or 'packer' forming member is next placed upon the upper ends of the eggs, pressure then being applied to the cushion forming member for forcing the eggs downwardly until the cushion forming member is in contact with the upper edge of the filler. A second filler is inserted in like manner as the first, and the succeeding or other layer of eggs is introduced to rest upon the last inserted cushion, and a third cushion forming member disposed upon this layer of eggs, pressure applied thereto for forcing down the same until said cushion engages the filler." (Page 2, lines 16–29.) As the height of the filler is not much more than that of an ordinary egg, it is apparent from this description— and this is borne out by figure three— that Miller expected the two sides of the cushion to be crushed until they nearly met. To be effective at all this presupposed that the material should give readily, and accordingly the second claim required "opposed members of yielding material."

Odell's two patents, No. 1,084,751, issued January 20, 1914, and No. 1,314,451, dated January 30, 1917, had no fillers, but the "flats" embraced the egg between two hemispherical cups. In one of his forms the cup was of almost the same height as the egg, and had a cover or top with a low cylinder in its centre, within which was a shallow cup on which the cup above rested. Arnold, No. 1,115,270, issued October 27, 1914, disclosed cylindrical "holders" of solid rubber with shallow cups at the top and bottom. Gill, No. 1,133,359, issued May 11, 1915, was like Odell's original form; it consisted of two hemispherical cups. In Bussey, No. 1,146,749, issued July 13, 1915, the surface of the "flat" was corrugated by troughs at an angle to each other of ninety degrees. There were several other endeavors, which we need not even summarily describe, because their only importance, like that of those we have just mentioned, is to show that the art had for over twenty years been experimenting with all sorts of egg holders. One of the patentees, Koppelman, had begun to concern himself with the problem before January 10, 1921, when he filed the application which issued on May 17, 1921, as patent No. 1,378,685. This is far enough away not to concern us, but on October 21, 1921, with one, Mann, he filed an application, eventually abandoned, figure three of which was substantially the same as the commercial device which succeeded, and which differed from the figures of the patent in suit only in the

cross section of the inside cup. As we shall show, it is not important here, both because it was too late and because it was not a prior invention. Mann & Koppelman had filed another application on February 18, 1921, which issued on April 18, 1922, as patent No. 1,413,047, in which the "holders" were truncated cones, but they had no interior, being cut through at the edge. Two "flats" were gummed together, back to back, like Miller's, and became a single "flat," one end of the eggs being held by the open ring of the lower frustum, and the other end by that of the upper.

The art of "pulp-sucking" had been known at least as early as 1908, but it was not familiar to many people, and it was expensive to practise. Nevertheless, it was presupposed in Gill's patents which were applied for in January, 1913, and an elaborate machine of the kind was applied for in December, 1915, and patented in January, 1917, No. 1,211,229. It cannot be said, in the light of the subsequent success of the plaintiff's commercial article, that the obstacles to making a "flat" like one member of Miller's cushion upon a "pulp-sucking" machine would have been serious to enterprising persons. The inducement was large and the expense would not have deterred the mere invention. Moreover, Miller was not an anticipation of the patent, even in form; rather it led away from it; the "flats" were not relied upon to support the eggs; they were not "relatively rigid." It was necessary first to conceive of making them so and then to use them singly. Perhaps the second would have followed the first; but nobody thought to do the first. The form of the "holder" was there, but it was barren of results for nearly nine years. Odell's cover for his containing cup would not have served as a "holder"; it had only the shallowest curve and was not intended to hold the egg, but the bottom of the containing cup above it. If it had been used as a "holder" the egg would have been displaced. True, the difference between it and the patent was structurally slight, but such differences count when a new conception is necessary to bridge them; nobody would be led to do so by Odell. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 18 F.(2d) 66, 68 (C.C.A.2); Regar & Sons v. Scott & Williams, 63 F.(2d) 229, 231 (C.C.A.2). Arnold was still further away; it was really a modification of Miller's notion of a double cushion and it was made of rubber and non-collapsible, because apparently

that was thought necessary. Mann & Koppelman's patent, which issued, besides being too late, was another false lead; the "holders" were not cups at all.

So it appears that the elements of the combination had been available for many years; that the art had always needed a good egg carrier; that a substantial number of persons had tried to make one; and that the patent had quick and almost universal acceptance. That makes the classical picture of an invention, unless there are some contradictory factors. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; B. G. Corp. v. Walter Kidde & Co., 79 F.(2d) 20 (C.C.A.2); E. I. Du Pont De Nemours & Co. v. Glidden Co., 67 F.(2d) 392, 394 (C.C.A.2). It is true that we do not know how many of these earlier efforts were known to the art. We do know that Gill was exploited, as well as the cushioned "flat" of Grant; but we cannot say the same of Miller, Arnold or Odell. But we do know that the Department of Agriculture had busied itself with egg breakage and that the trade was concerned about it; it seems inevitable that there were at least some who followed what had been discovered, and them at least it did not stimulate to a solution. The situation seems to us one in which more was required than the talents of the ordinary skilled man; not because there were technical difficulties, but because ingenuity lagged.

The judge made no finding as to the date of the invention so that we are confined to the record; but Koppelman and Mann both swore to an interview with Cooper on February eighth, 1921, in which the form of the "holder" was decided on. (Cooper was sick at the trial and could not appear.) This date was fixed by a diary of Mann's and a notation upon a sketch produced at the trial of Holed-Tite Packing, Inc., v. Mapes, supra. There is no reason to suspect its authenticity, and the doctrine of The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154, has never been carried so far as to require a court to impute fabrication and forgery to a witness, even though he be the inventor. Both swore that Koppelman talked over the form of the "holder" with Cooper, who made certain suggestions and put them down on the sketch. One of them plainly shows in cross section the Mann and Koppelman patent, No. 1,413,037, filed ten days

later; a hollow frustum into the top of which the egg shall fit. The figure marked "Fig. 1" is a complete showing of the invention in suit, except that it is the cross section of a cylinder, rather than of a frustum, a difference which is not essential. There is nothing, it is true, to show that the "holder" was to be made by the pulp sucking process, but it is clear that this was assumed, for at page 1, lines 100–104, of patent No. 1,413,037, the process of producing the sheets is stated, and at page 2, lines 44–47, the "relative rigidity" of the holders is mentioned. It is also true that the sketch represents the "flats" as back to back so as to make a single member like Miller and Mann & Koppelman, No. 1,413,037; nor do we count it as significant that a line runs horizontally between the two. But the important thing is that the holders were not intended as cushions to be crushed down; the lower holder would merely hold the top of the egg. That was apparently found unnecessary, and in any case the claims would cover a double and a single "flat" equally well. For these reasons we think that the date was successfully carried back to February 8, 1921. Even if it had not been, Alexander Milburn Company v. Davis-Bournonville Co., 270 U.S. 390, at page 402, 46 S.Ct. 324, 70 L.Ed. 651, expressly excepted from its doctrine abandoned applications in the Patent Office.

We agree with the judge that claim one is not infringed. The phrase, "adapted to hold" the egg "by contact therewith," refers to the rim, and the rim of the defendants does not touch the egg at all, even were we to ignore the fact that their holders are neither round nor conical. This claim was clearly drawn to the figures and in view of the later and more general claims, should be limited to them. This consideration disposes also of claims three and four. Claim eight does not contain that clause, but it does speak of the effect of an egg's being "forced in between said edges," and that it may be "wedged therein without pressing against" the bottom. That language must refer to the "keystone effect," mentioned in the specifications (page 3, lines 37–40), for an egg can hardly be wedged into the defendant's "holder"; it touches only its inner walls, which cannot grip or hold it. For this reason, again disregarding the fact that the holder is not annular, we think that claim eight is also not infringed. Claim nine was drawn to express the patent in its broader character. As we have said, the invention was essentially in using Miller's round bosses not as collapsible cushions, but as "holders," which required that they should be stiff enough to protect the egg, but yielding enough to give, when unusual sizes had to be pressed into place, or when jars or shocks must be endured. The form of the holder is not important in this aspect, provided it is a cup with a solid interior and—what necessarily followed from that —had outer and inner walls which yield and then resume their shape. Nobody had done that before, and it was the combination which the trade needed. Whatever may have been the purpose of the draftsman of this claim those were the only elements that he put into it, and they were enough. He prescribed "fillers" ("upright compartment forming members"), "flats" ("flat members at top and bottom of said upright members and normally in contact therewith"); and stiff "holders" ("said flat members having relatively rigid holders projecting into compartments"), which should be open ("each of said holders being pre-formed with an aperture at its upper part"), but cupped to hold the egg ("a cup-like member inside it to receive the end portion of the egg"), without spreading when the "fillers" and "flats" were assembled ("without material expansion or compression when the compartment forming members and flat members are in normal position"). The patent was a long advance; it gave to the trade a new protection it had sought for many years; the inventors' protection ought to be correspondingly liberal. The defendants may have a better holder, but it stands upon the patentees' as that was described in claim nine.

Decree affirmed as to claims 1, 3, 4 and 8; reversed as to claim 9, and cause remanded for proceedings consistent with the foregoing.