**GASOLINE PRODUCTS CO., Inc., v. COE, Commissioner of Patents.**

**No. 6492.**

United States Court of Appeals for the District of Columbia.

Decided Dec. 7, 1936.

Harry H. Semmes, of Washington, D. C., and Newton A. Burgess, of New York City, for appellant.

R. F. Whitehead, Solicitor, U. S. Patent Office, D. C., for appellee.

Before MARTIN, C. J., and ROBB, VAN ORSDEL, GRONER, and STEPHENS, JJ.

STEPHENS, J.

The appellant, hereafter referred to as plaintiff, is assignee of the patent application of one John C. Black, filed November 6, 1922, Serial No. 599,403, in the United States Patent Office, for a heating coil for cracking hydrocarbon oils. The application was duly prosecuted, but certain claims thereunder were rejected by the Examiner, and on appeal to the Board of Appeals that Board affirmed the Examiner's rejection. The plaintiff then filed a bill in equity in the District Court, under Section 4915 of the Revised Statutes (35 U.S.C.A. § 63), seeking a decree that the plaintiff is entitled to receive letters patent for the invention of Black as specified in the claims and that the appellee, United States Commissioner of Patents, hereafter referred to as defendant, be authorized and directed to issue such patent. The defendant answered, admitting the filing and due prosecution of the application, and the rejection of the claims, but asserting that they were unpatentable over certain patents mentioned below.

Black's claims relied on, numbered 13–16 inclusive, are as follows:

"13. In an apparatus for cracking petroleum oils for the production of lower boiling hydrocarbon oils, a metallic cracking coil substantially resistant to the action of sulphur, said metallic coil being composed of an iron and chromium alloy, said chromium in the alloy being in such proportions as to substantially prevent the corrosive action of sulphur.

"14. In an apparatus for cracking petroleum oils for the production of lower boilling hydrocarbon oils, a metallic cracking coil substantially resistant to the action of sulphur, said metallic coil being composed of an iron chromium nickel alloy, said alloy being in such constituent proportions as to substantially prevent the corrosive action of sulphur.

"15. An apparatus for cracking hydrocarbons comprising a furnace, a cracking coil positioned within said furnace, said coil being formed of material comprising an alloy of iron and chromium substantially resistant to the corrosive action of sulphur and means in said furnace for supplying products of combustion thereto.

"16. An apparatus for cracking hydrocarbons comprising a furnace, a plurality of tubes in said furnace through which the oil to be cracked is passed under pressure, said tubes being formed of an alloy of iron chromium and nickel, substantially resistant to the action of sulphur under the conditions of cracking, and means for

passing hot products of combustion over said tubes to crack the oil therein."

In his specification Black said:

"I have discovered that the presence of sulphur in the hydrocarbons, either as free sulphur or as sulphur compounds, will readily attack the steel of the tubes when the coil is in operation under the high pressure and high heat employed in the process. To overcome this difficulty, I prefer to use an alloy steel such as nickel steel or chrome nickel steel, or I may use a tube which has been heat-treated with aluminum wherein a thin coating of aluminum iron or aluminum steel alloy is produced which acts as a protective surface to the tube and prevents to a great extent the destructive action of the sulphur or sulphur compounds."

It will be noted that claims 13 and 15 describe the material as an "iron and chromium alloy," and claims 14 and 16 as an "iron chomium nickel alloy." For convenience the alloy will hereafter be referred to as "chromium alloy."

The patents cited by the defendant are the following: Palmer, 1,268,763, June 4, 1918; Gillespie, 1,306,690, June 17, 1919; Kelley, 1,365,499, Jan. 11, 1921; Van Steenbergh, 1,407,339, Feb. 21, 1922; Metzger, 1,422,878, July 18, 1922; and Black, 1,426,-813, Aug. 22, 1922. At the trial below the patent application, the Examiner's Statement, the decision of the Board of Appeals, and the patents cited were in the usual course made a part of the record, and in behalf of the plaintiff an expert witness, one Enslo S. Dixon, testified. No testimony was introduced for the defendant. At the conclusion of the hearing, the trial court made the following findings and conclusions:

## "Findings of Fact.

"1. Plaintiff's application discloses and claims apparatus for cracking hydrocarbons in which the cracking coil is composed of an alloy of iron and chromium, and of iron, chromium and nickel to make it resistant to sulphur corrosion in hydrocarbon oil cracking.

"2. The patent to Palmer, 1,268,763, discloses apparatus for making gas from bituminous coal, the retort of the apparatus being formed of ni-chrome steel to make it resistant to oxidation.

"3. The patent to Metzger, 1,422,878, discloses a retort formed of iron coated with an alloy containing chromium and nickel to make the retort resistant to the corrosive or oxidizing action of the retort or furnace gases.

"4. The patent to Kelley, 1,365,499, discloses a process for surface treating a metal with chromium to form a surface that is resistant to corrosion and oxidation.

"5. The patent to Van Steenbergh, 1,-407,339, discloses apparatus for cracking mineral oil in which apparatus the tubular preheating coil .. is made of the well-known alloy of chromium and nickel commonly used as an electrical heating element.

"6. The patent to Black, 1,426,813, discloses a process and apparatus for the production of low boiling point hydrocarbons in which apparatus cracking coils are employed.

## "Conclusions of Law.

"1. The claims are unpatentable over the prior art adduced by defendant.

"2. No invention would be involved in making the cracking coils of the Black patent of an alloy of iron and chromium, or of an alloy of iron, chromium and nickel in view of the patents to Kelley, Metzger, Palmer and Van Steenbergh.

"3. Plaintiff is not entitled to a decree for the claims and the Bill will be dismissed."

A decree was thereupon entered dismissing the bill of complaint, and this appeal was taken.

It appears from the briefs and record, including the testimony of the witness Dixon that: The cracking process of treating gas oil or fuel oil in a still under high pressure (400—600 pounds to the square inch) and at high temperatures (oil temperature, 700°—1050° F.; tube, or coil, temperature, as high as 1300° F.), causing a dissociation or "cracking" of the gas oil or fuel oil and producing gasoline, has come into common use in the petroleum industry. The use of tubes, or coils (the words are used interchangeably in the record) to conduct the oil in this process commenced about 1915 with the introduction of the so-called Burton Clark installation. The tubes were customarily made of carbon steel or iron and, for some reason apparently not understood by the experts in the industry until Black's discovery of sulphur or sulphur compounds as the cause, they were rapidly corroded, or eaten away, during the cracking process. The corrosion was at a rate of approximately one-quarter of an inch per year, through the

side wall. This weakened the tubes and resulted in frequent explosions and fires with consequent serious loss of property and life, and interruption of the industrial process. Also, because the corrosion was "spotty," that is, not uniform, external inspection of the tubes would not disclose their exact condition, and the consequent uncertainty with respect to their safety impaired labor morale. To the extent that explanation of the corrosion process was suggested, the theory in the industry, until Black, was that it was due to acidic constituents, mineral or organic, in the oil; the prevalent thought was that the corrosion was an organic acid corrosion. As late as 1921 a report by W. C. Lauer, a chemist, detailed to the study of cracking and steel practices, attributed the cause of corrosion in steel units to acids and not to sulphides. This prevalent view in the industry suggested the use of acid resisting metals such as copper and nickel alloys. Black's application, disclosing the use of chromium alloy tubes, was filed, as above stated, in 1922. In 1923 Dixon had been employed by The Texas Company as a metallurgist connected with its research laboratory, and in 1924 he heard of the asserted invention of Black and installed a chromium alloy cracking coil in a still of The Texas Company. This showed no corrosion when examined after two years' use; other chromium tubes, installed in 1926, also gave no evidence of corrosion after two years. Since 1928–1929, eighty percent of the tubes of The Texas Company have been made of chromium alloy, and cracking coils made of chromium alloy have gone into wide commercial use in the industry. At the Port Arthur plant of The Texas Company the use of the new type of tube has been attended by practical results of great value. Dixon summarized the advantages of chromium alloy tubes as follows:

"The corrosion rate is much lower;

"The scale rate is much lower;

"The strength is much higher;

"The ability to swell prior to rupture is very marked;

"The ability to stand higher temperature without failure is important;

"The tendency toward sagging is less and, therefore, less necessity exists for intermediate supports;

"They will operate with a thicker coke formation without failure;

"The tendency to burst wide open suddenly is much less than with carbon steel;

"The wear resulting from cleaning the tubes with the metallic tube cleaner is less in view of the toughness of the chromium alloy tubes; because of this toughness there is less erosion from the gas and oil;

"The wasting away of tubes from erosion, that is, the rush of oil through the tubes, is less with chromium alloy than with carbon steel;

"We can use a less amount of metal in the chromium tubes than in the carbon steel for the same service; this would result in a thinner wall for the tube, which, in turn, would avoid internal stresses which we feel have been causes of rupture; thinner walls of tubes afford more efficient heat transfer;

"There is less danger with chromium alloy tubes by direct flame impingement in case fire gets out of control; and less trouble with chromium alloy tubes in putting on return bends after cleaning because of the smaller amount of bending of the chromium alloy tubes during operation;

"Since there are fewer renewals of chromium alloy tubes, there is less labor necessary because the tubes last longer.

"Now, each of these advantages that I have enumerated, is a real substantial advantage from a practical standpoint, and are so recognized in such conferences as I sit in.

"The most prevalent danger to life and equipment in connection with oil cracking prior to the adoption of the chromium alloy tubes was tube failures. Some of the sources of danger from that angle are:

"The tube thins down from corrosion, sometimes rapidly, while it is still operating under pressure and temperature and with a higher through-put rate under pressure as the tube becomes hot its strength is decreased and, being thin from corrosion, it bursts open.

"This presents a hazard to life and a loss of money from property.

"Since the pump is charging the oil through the tube, it is necessary to cut down the charge, stop it, but this can not be done right away. Much oil passes through the rupture and, of course, ignites. The battery may be enveloped in flames and sometimes it is impossible for an operator to shut off the proper valves, and the fire continues. Frequently it is attended

with loss of life. This is particularly true of outside lines. Outside lines are much more dangerous, much more of a hazard, than tubes in the furnace. By 'outside lines' I mean those outside the cracking furnace, such as a line going from the preheater. It is really a part of the heater coil; your pump discharge allowing circulating of the hot oil into the preheater; vapor lines always.

"That outside line is a part of the cracking system.

"At Port Arthur, where I was located, fires as a result of tube failures, prior to the adoption of the chromium alloy tubes, were very frequent. I would say that once a month would be very conservative; sometimes more often.

"Since the chromium alloy tubes have been installed, tube failures are a rare occurrence; they are almost inexcusable. The alloy does not suffer spotty corrosion; it corrodes slowly enough that it can be graded; the operator can know what to run his temperature and pressure."

The question in the case, therefore, is whether Black's discovery that the presence of sulphur or sulphur compounds in the hydrocarbons treated in a cracking process is the source of corrosion in carbon steel or iron tubes, and his substitution for such tubes of tubes made of iron and chromium alloy or of an iron chromium nickel alloy, with the results above set forth, constitute invention.

The position of the defendant is that prior to Black "the patents cited taught that the chromium alloy was resistant to corrosion and that that necessarily included corrosion brought about by the presence of sulphur in the material which was brought into contact with the metal," and also that "the art taught broadly that chromium steel would resist corrosion and therefore when it was found that the pipes in a cracking apparatus corroded during the carrying out of the cracking process, it was not invention to substitute for the steel pipe previously used a similar pipe made of chromium alloy." As above stated the defendant called no witnesses. He relied upon certain cross-examination, mentioned below, of Dixon, and upon the patents above referred to. In his brief in this Court he refers particularly to Metzger, but apparently relies also on all of the other patents referred to, except Black, 1,426,813. That patent is for a process for cracking hydrocarbons. It discloses tubular cracking coils, but not the use of the alloy recited in the claims in the instant case.

The patent to Gillespie, 1,306,690, is for improvements in sheet metal. Gillespie claims a new article of manufacture having an incorrodible surface consisting of a sheet of mild steel coated on one side with a sheet of chromium alloy steel of the kind known as stainless steel. The specification states that the sheet is to be used for the manufacture of cans for the packing and storage of fruits, pickles and other solid food stuffs, and for saucepans and like culinary utensils, and for dental plates and artificial teeth, and discloses further that the sheet steel and the articles mentioned made of it are "incorrodible to the extent that they are proof against all ordinary culinary acids, fruit juices and the like." The patent teaches nothing concerning the capacity of chromium alloy to resist sulphur corrosion, and nothing concerning the use of chromium alloy tubes in the oil cracking process.

The patent to Kelley, 1,365,499 is for improvements in surface alloyed metals. The specification discloses a method of forming a layer of chromium alloy upon a foundation metal such as iron, nickel, molybdenum or tungsten. It discloses that such chromium treated metal resists corrosion in the presence of moisture, for example, a salt spray. This patent again teaches nothing in respect of the capacity of chromium alloy to resist sulphur corrosion, and nothing concerning the use of chromium alloy tubes in the process of oil cracking.

The patent to Van Steenbergh, 1,407,339, is for improvements in apparatus for cracking mineral oil to produce gasoline. The specification discloses, as a part of the whole apparatus described, a so-called preheater to be used for raising the temperature of the oil before it enters the cracking process proper, and discloses, in this preheater, tubes, or pipe sections, composed of chromel, an alloy of nickel and chromium. This alloy is used, however, merely because of its qualities to resist an electric current and thereby to produce heat, and is not used in the cracking process proper. Nothing is taught in this patent of resistance by these chromel tubes to corrosion generally, or to corrosion by sulphur.

The patent to Palmer, 1,268,763, is for improvements in the process of, and ap-

paratus for, making natural-gas substitute. The specification discloses a retort "constructed of a highly refractory, nonoxidizable metal such as ni-chrome steel, though nickel steel or nickel may be also employed in lieu thereof." The retort is to be filled with bituminous coal and heat applied to generate gas. In one of the claims the retort is described as "being relatively narrow and having extremely thin, refractory, substantially non-corrosive walls consisting principally of nickel ..," and in another claim a similar description of the retort is given, but the walls, or envelop, are said to consist "principally of ni-chrome." In the specification Palmer points out that because "the nickelous portion of the envelope is extremely thin ... [It is] at the high temperature to which it is subjected ... at least partially pervious to the passage thereinto of the strongly oxidizing external gaseous heating medium, such as the producer-gas and hot air mixture which is preferably employed by me. The result is that the deleterious action of the carbonizing and carbid-forming gas within the retort upon the inner exposed layer of the envelop is substantially, if not entirely, prevented, .." The Palmer patent does not in terms disclose that the inventor was aware of any exposure of the nichrome envelop to sulphur corrosion. It was brought out, however, in the cross-examination of the plaintiff's witness Dixon at the trial below, that sulphur is found profusely in soft coal, and that sulphur gases would therefore be produced within the Palmer retort and brought into contact with the inside thereof. By this the defendant sought to show that the Palmer patent, although not in terms, nevertheless actually, taught that the nichrome envelop was subject and resistant to sulphur corrosion. But upon the redirect examination of Dixon it was further shown that "under the circumstances existing inside the retort, .. of the Palmer patent, there would not be presented any question of sulphide corrosion, not even if there were the permissible amount of sulphur in the coal used. That is because the sulphide under the temperature of this retort is so high in

temperature and dry that it does not, would not, attack this retort even if it were steel."[2]

The patent to Metzger, 1,422,878, is for an improvement in retorts. The specification discloses: "In many manufacturing operations where retorts, furnaces and the like are subjected to a high temperature it is desirable to employ iron or other similar relatively cheap and plentiful metal as the retort or furnace material. For example, in the manufacture of coal gas, oil gases and in certain processes employed to effect the fixation of atmospheric nitrogen and in numerous other processes not necessary to be mentioned, iron retorts or furnaces would be highly desirable were it not for the fact that the corrosion or oxidation of the retort or furnace is quite rapid at the rather high temperatures required in these processes." The specification further discloses that to meet this problem an alloy of nickel and chromium is to be used as a protective coating for a retort or furnace of iron and states that the principal object of the invention "is to provide the iron or other similar corrodible material which may be employed for the construction of retorts or furnaces to be employed for the purposes previously stated with a coating of metal which will offer substantial resistance to the corrosive action of the retort or furnace gases, ..." As above pointed out, the Metzger patent is the one principally relied upon by the defendant in his brief. This again, as in respect of Palmer, is apparently upon the theory that, although the patent does not in terms disclose exposure of the alloy of nickel and chromium to sulphur, it does so actually for the reason that in the manufacture of coal gas, coal will be used and coal contains sulphur. But since the Metzger patent discloses a use of the retorts and furnaces referred to under conditions of "high temperature," it appears to be true of the Metzger patent as well as of the Palmer patent (i. e., for the same reason) that it teaches nothing of the resistance of chromium alloy to sulphur corrosion.[3]

We think it must be concluded that, while the patents above reviewed disclose

[2] The Palmer specification indicates that the retort envelop is exposed to a temperature of 1100° C. Dixon had testified that the oil temperature in the cracking process is 700°-1050° F. and that the tube temperature is as high as

1300° F. 1050° F. is but 565.5° C. and 1300° F. is but 704.4° C.

[3] It seems proper to conclude that Metzger's "high temperatures" are as high as that of Palmer, because both Palmer and Metzger make gas from coal under similar conditions.

that chromium alloy is resistant to certain types of corrosion, such as that caused by "culinary acids, fruit juices, and the like," moisture in the form of a salt spray, carbid-forming gas, and furnace gas, and so disclose that chromium alloy is, in a loose general sense, a corrosive resistant, none of them teaches that it is a resistant to sulphur corrosion in general, or to sulphur corrosion specifically in an oil cracking process. We think that the position of the defendant that "the art taught broadly that chromium steel would resist corrosion ..." is but a generalization from the teaching of the art that chromium alloys are resistant to certain kinds of corrosion, and that it is too wide a generalization. It is not to be inferred from the fact that chromium alloys are resistant to corrosives of certain kinds that they are resistant to corrosives of all kinds.

■ It is asserted in the brief for the defendant that "the record of the application shows that the examiner stated it was a matter of common knowledge that such tubes were resistant to sulphur corrosion." We are unable to find in the Examiner's Statement, or elsewhere in the record, such a statement. The Examiner does say: "Applicant makes the tubes of the coil out of an alloy steel such as nickel steel or chrome nickel steel because these materials are resistant to the corrosive action of sulphur and sulphur compounds which are ordinarily present in hydrocarbon oils, and which attack ordinary steel tubes." This is somewhat ambiguous. It might be construed to mean that the applicant makes the tubes out of the materials mentioned because it is commonly known that the materials are resistant to the corrosive action of sulphur; but it might with equal logic be construed to mean that the applicant makes the tubes out of the materials mentioned because he has himself found that those materials are resistant to the corrosive action of sulphur. It is true that in the reply brief for the plaintiff the following appears:

"The Commissioner's brief states (Br., p. 4) that:

" 'In fact, the record of the application shows the examiner stated it was a matter of common knowledge that such tubes were resistant to sulphur corrosion.' "Obviously the Examiner's statement that such was common knowledge is no proof that it is a fact."

While this might be taken as an admission by the plaintiff that the Examiner had made the statement attributed to him by the brief for the defendant, it must be taken also as a denial that such a statement by the Examiner constitutes proof that it was common knowledge that chromium alloy tubes are resistant to sulphur corrosion. The Examiner's Statement said also: "All of these patents show that it was known before applicant thought of building cracking coils of the alloys in question that such alloys were non-corrosive to sulphur and sulphur compounds ...." But in our view of the disclosures of the patents cited, this statement is not supportable. The findings of fact by the trial court contain nothing to the effect that it was common knowledge that chromium alloy tubes are resistant to sulphur corrosion, and in the absence of a finding to this effect and of any definite evidence in the record on the subject, and in view of the further fact that the decree below was founded solely on the disclosures of the references, we think that the case should be decided without reference to such proposition.

■■ In our view of what the prior art discloses, we think the conclusions of law made by the trial court to the effect that the "claims [of the plaintiff] are unpatentable over the prior art adduced by the defendant," and that "no invention would be involved in making the cracking coils ... of an alloy of iron and chromium, or of an alloy of iron, chromium and nickel in view of the patents to Kelley, Metzger, Palmer and Van Steenbergh," are not warranted. We think that on the contrary under the record as we view it, i. e., as failing to show that the prior art taught that chromium alloy was resistant to sulphur corrosion as such, or to sulphur corrosion in the tubes of an oil cracking process, the plaintiff is, under settled principles of patent law, entitled to a patent. The plaintiff discovered that the cause of corrosion in ordinary carbon steel or iron tubes in the oil cracking process was sulphur or sulphur compounds. There is no dispute in the record on this point. And the plaintiff was the first to use chromium alloy tubes in the oil cracking process; and through their use he first solved the corrosion problem. Discovery of a source of trouble not before known and the discovery and application of a remedy are well recognized as invention. Ei-

bel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

■ Apparently the defendant's contention that "the art taught broadly that chromium steel would resist corrosion [we have said *supra* that in our view this is too wide a generalization] and therefore when it was found that the pipes in a cracking apparatus corroded during the carrying out of the cracking process, it was not invention to substitute for the steel pipe previously used a similar pipe made of chromium alloy," seeks to invoke the well settled rule of Hotchkiss v. Greenwood, 11 How. 248, 266, 13 L.Ed. 683, that mere substitution of materials in a known machine cannot be regarded as invention entitling to a patent for the reason that in such cases, generally speaking, the difference is formal and affords nothing more than "evidence of judgment and skill in the selection and adaptation of the materials." But there is a well known exception to that rule, thus stated by the Supreme Court in Hicks v. Kelsey, 18 Wall. 670, 673, 21 L.Ed. 852:

"The use of one material instead of another in constructing a known machine is, in most cases, so obviously a matter of mere mechanical judgment, and not of invention, that it cannot be' called an invention, *unless some new and useful result, an increase of efficiency, or a decided saving in the operation, is clearly attained.*" [Italics supplied.]

This was put definitely into the positive in Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 496, 497, 23 L.Ed. 952, where the Supreme Court said:

"But where there is some such new and useful result, where a machine has acquired new functions and useful properties it may be patentable as an invention, though the only change made in the machine has been supplanting one of its materials by another."

This exception to the general rule of Hotchkiss v. Greenwood has been given effect in many well known cases. See for example: United Shoe Machinery Corporation v. E. H. Ferree Co. (C.C.A.) 64 F.(2d) 101, certiorari granted, 290 U.S. 614, 54 S.Ct. 69, 78 L.Ed. 537, dismissed per stipulation of counsel, 290 U.S. 708, 54 S.Ct. 129, 78 L.Ed. 608 (substitution of aluminum for cast iron in the hammer arm of a clicking machine used in cutting shoe uppers); Re Harbeck, 39 App.D.C. 555 (substitution of fused cement for a soluble adhesive for holding together the layers of paper vessels); Yablick v. Protecto Safety Appliance Corporation (C.C.A.) 21 F.(2d) 885 (substitution of copper sulphate for sulphuric acid and pumice in gas masks for the absorption of ammonia from ammonia saturated air); George Frost Co. v. Cohn (C.C.A.) 119 F. 505 (substitution of rubber for metal in a hose supporter button); Low v. McMaster (C.C.A) 266 F. 518 (substitution of a solid for a liquid fuel in a vulcanizing apparatus). In the case last mentioned the court stated the law as follows:

"On this subject it is the law, that merely to substitute superior for inferior materials, in making one or more or all of the parts of a machine or manufacture, is not invention, although the substitution may be of materials that are both new and useful in high degree. It is also the law, as exceptions to this general rule, that if the substitution involved a new mode of construction; or if it developed new properties and uses of the article made; or where it produces a new mode of operation, or results in a new function; or when it is the first practical success in the art in which the substitution is made; or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention." [266 F. at pages 519, 520]

We think therefore that even within the defendant's view of what the art taught broadly, the undisputed evidence in the case concerning the advantages obtained by using chromium alloy tubes in the oil cracking process entitles the applicant to a patent. He clearly accomplished at least "an increase of efficiency" and "a decided saving in the operation" within the language of Hicks v. Kelsey. Within the words of Low v. McMaster: his machine has acquired "new properties and uses"; his "is the first practical success in the art in which the substitution is made"; and "the practice shows its superiority to consist not only in greater cheapness and in greater utility, but also in more efficient action, . . . ."

In accordance with the foregoing the decree of the trial court is

Reversed.