**BLACK v. RICHFIELD OIL CORPORATION.**

No. 10417.

Circuit Court of Appeals, Ninth Circuit.

Dec. 12, 1944.

Rehearing Denied Jan. 29, 1945.

Oliver O. Clark, Philip Subkow, Irving M. Walker, and Robert A. Smith, all of Los Angeles, Cal., for appellant.

Leonard S. Lyon, Charles G. Lyon, and Robert E. Paradise, all of Los Angeles, Cal., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The subject matter of this suit is an agreement made in 1925 between appellant Black and the Pan American Petroleum Company by the terms of which Black licensed the use of certain of his inventions in consideration of the payment of a royalty. The controversy arose because of the omission from the agreement of Black's patent application No. 599,403, filed November 6, 1922. This application culminated in the issuance on March 30, 1937 of patent No. 2,075,164. Cf. Gasoline Products Co. v. Coe, 66 App.D.C. 333, 87 F.2d 550. The patent relates to the use of chrome alloy tubing in the cracking of oil in lieu of the ordinary steel or iron tubes previously employed in the process. The advantage of using chromium alloy is that

it is resistant to the corrosive effects of sulphur present in petroleum.

Black was plaintiff below. In the first count of his complaint he sought a declaration of rights under the licensing agreement. In the second he asked that the agreement be reformed so as to include his patent described above. The third count was for an accounting. The court thought that the omitted invention could not properly be supplied by resort to extrinsic evidence of intention and that reformation could not be had as against appellee. The suit was dismissed.

We summarize the facts as they appear in the court's findings and opinion, making liberal use of the verbiage of the latter. In 1920 Black became superintendent of refineries for the Doheny interests, which at that time controlled the Pan American Petroleum and Transport Company and the Pan American Petroleum Company. He had earlier developed a high pressure process for the cracking of oil, known in the industry as "Black's Process." In 1924 he licensed certain of his inventions to the Pan American Petroleum and Transport Company. In 1925 Doheny disposed of this company but retained his interest in the other corporation mentioned above. The latter asked that a licensing agreement be executed by Black in favor of itself.

The agreement—being the one in litigation here—was drafted by an attorney for Pan American and sent to Black with a letter stating that the writer was not familiar with the various inventions and had accordingly used the patent and application numbers employed in the 1924 contract.[1] The matter of checking these patents and applications, as also the references to them, was left entirely to Black. The latter inserted two additional application numbers, signed the contract, and returned it. The agreement bears date September 15, 1925. So much of it as appeals essential to an understanding of the case is copied on the margin.[2]

---

[1] Application No. 599,403 had not been listed in the 1924 contract either.

[2] "The Licensor is the owner of certain new and useful inventions for the extraction of gasoline from petroleum, also the reduction of viscosity of petroleum products, consisting of certain high pressure processes. The Licensor represents that by means of these processes and apparatus an amount of gasoline in addition to the natural gasoline content of the petroleum can be extracted by 'cracking' of the oil. Three letters patent of the United States, numbered 1426813, 1431772 and 1456419 respectively, have been issued, and ten applications for letters patent, numbered 714070, 602439, 569757, 344406, 492337, 596836, 712156, 49843, 53334 and 596837 respectively, are now pending in the United States Patent Office, with respect to these inventions. These patents and applications are referred to for full particulars with respect to the nature and character of said processes and apparatus and are hereinafter for convenience referred to as the processes for the extraction of synthetic gasoline.

"The Licensor has also invented and perfected and is now engaged in perfecting a number of other inventions useful in the conduct of the business of the Licensee and which relate to matters other than the extraction of gasoline and the reduction of the viscosity of petroleum products. Applications for letters patent with respect to these inventions are now pending in the United States Patent Office and are numbered 569156, 712156, 596837, 595660, 690207, 690874, 587006, 622386, 630147, 690206 and 371399 respectively. These applications are referred to for full particulars as to the nature and character of said inventions.

"The Licensee is engaged in the business of producing, refining, buying, selling and generally handling petroleum and petroleum products, and in its operations it is now using certain of the inventions above referred to (including both the processes for the extraction of synthetic gasoline and also some inventions with respect to other matters,) and desires to continue such use and also desires to obtain the right to use and employ any or all of the above mentioned inventions, processes and apparatus in connection with the conduct of any of its business.

"Now, therefore, in view of the facts above recited, and in consideration of the covenants and agreements of the parties hereto hereinafter contained, the parties hereto covenant and agree as follows:

"(1) The Licensor for himself, his heirs and assigns, hereby grants to the Licensee, its assigns and successors in interest, the right, privilege and license to use and employ in the conduct of the business of the Licensee any and all of the above mentioned inventions, processes and apparatus and any and all improvements thereto and inventions of a similar nature which may be hereafter made by the Licensor.

"(2) The Licensee agrees to pay the Licensor, for the use of any and all of said above mentioned inventions, processes and apparatus, a royalty to be computed upon

In 1928 the Richfield Oil Company of California acquired the controlling interest in Pan American Petroleum Company. Later a receiver was appointed for the former and it, together with its named subsidiary, was ultimately brought into reorganization under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. As an outgrowth of this proceeding. appellee was organized. The latter submitted to the bankruptcy court a plan whereby it proposed to purchase the assets of the old Richfield Company and its subsidiaries and assume certain existing liabilities of the trustee, including such contracts as had been affirmed by the court. To this end the new company (appellee) raised some $20,-000,000 in cash and acquired by purchase the assets of the debtor. As part of the arrangement it assumed the licensing agreement of September 15, 1925.

At the time of the reorganization the new company contemplated the abandonment of the "Black Process" and planned entering into a refining management contract with Sinclair Refining Company. With this end in view it had a patent attorney make an examination of the license agreement for the purpose of ascertaining whether or not it would be liable for the payment of royalties if, in the operation of a new plant, it ceased using Black's process. Upon consummation of the sale under the provisions of § 77B appellee made the anticipated arrangement with the Sinclair people and built another refinery, on the completion of which it abandoned the old plant. Up to the time of the abandonment it continued to pay a royalty to Black.

When, in October of 1938, the royalty payments ceased Black was advised that appellee was no longer using any of the inventions described in the licensing agreement. He insisted that the patent issued upon application No. 599,403 was in use, but his attention was called to the fact that this invention was not included in the agreement. This interchange was the occasion of Black's learning for the first time of the omission of the invention.

Appellee concededly uses the inventions described in application No. 599,403, but justifies their use under a licensing arrangement between Sinclair Refining Company and another concern, namely, the Gasoline Products Company. To go back a little, Black, in December 1925, made a contract for the sale to Gasoline Products Company of all his previously conceived inventions, reserving the right to retain royalties paid by the Pan American Petroleum Company under the licensing agreement in dispute. Application No. 599,403 was included in the list of inventions embodied in the sale contract.

The contract contained the following recital: "Whereas, the Pan American Petroleum and Transport Company and its subsidiaries and the Pan American Petroleum Company have an interest in certain of said inventions and Letters Patent as shown by the agreements, copies of which are hereto attached marked Schedule 'B,'" etc. Thus, had Black been at all diligent, he would have observed at the time of the sale of the invention in question that it had not been listed in the licensing agreement once more immediately before him. The court found that he was put on notice of the omission at that time.

From the oral showing which Black was permitted to make the court found that it was the mutual intention of the original parties to include patent application No. 599,403 in the licensing agreement. However, being of opinion that the written agreement is clear and certain in its identification of the subject matter, the court declined to rectify the mistake by reading the patent into the contract; and as already stated it refused to grant reformation.

As one of its arguments for affirmance appellee contends that in no event is it obliged to pay royalties for the use of patent No. 2,075,164, this for the reason that the original contracting parties did not intend that royalties be paid for that invention except when it was used in connection with Black's high pressure processes. The view is said to be confirmed both by the contract itself and by the oral testimony. The trial court did not rule on this contention and we find it unnecessary to discuss or decide it. Accordingly we pass at once to the matters urged by appellant.

1. We are asked to hold that the licensing agreement is uncertain in its identification of the subject matter, hence resort should be had to extrinsic evidence to determine and declare the true meaning of the writing. Numerous considerations, un-

the gasoline extracted by means of the processes for the extraction of synthetic gasoline and paid in the manner following, to wit:" Then follows the provision for the computation of the royalty.

necessary to state in detail, are assembled in an attempt to support this view. The arguments are but variants of a single theme, namely, that the instrument contains language indicative of a purpose to license a class of inventions rather than to limit the grant to those designated by patent and application numbers.

We think otherwise. The agreement shows on its face that it was the purpose of its drafters to enumerate specifically the several letters patent and pending applications for patent which were to be the subject of the grant. The same purpose, so the court found, is evidenced by the testimony dehors the contract. The purpose was carried out in such manner as to leave nothing to speculation. There was no error in the serial numbers as written nor was any of the designated numbers intended as a reference to No. 599,403. Uncertainty might have developed out of the verbiage of the granting clause licensing improvements and inventions "of a similar nature which may hereafter be made by the licensor"; but we are here concerned only with an existing patent application—one as readily capable of exact designation as were any of those named. The case involves, not an ambiguity, but simply an omission.

The California law is admittedly controlling. A statute of that state (§ 1858, Cal. Code Civ.Proc.) provides that, in the construction of an instrument, "the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted." [3] The local decisions, like those of the courts elsewhere, are in harmony with the elementary principle declared by the statute.

We need not stop to analyze the cases or to quote extensively from them. The language of the court in Wright-Callender-Andrews Co. v. Eaton, 47 Cal.App. 685, 688, 191 P. 68, 69, may be taken as an example of the way the rule is expressed:

"Suffice it to say that where parties deliberately and solemnly put their agreement in writing, using language which imports a complete expression of the whole agreement, the law presumes that they have introduced into it every material item and term intended to be inserted therein, and parol evidence cannot be admitted for the purpose of adding other terms or items thereto." And in Osborn v. Hendrickson, 8 Cal. 31,[4] the court said: "The question was, not whether the consideration could be inquired into, but whether the sale included a matter not described in the bill of sale. Parol evidence could not add to the writing a description of property not embraced in it. If the bill of sale was defective in this particular, the party should have instituted a direct proceeding to reform the instrument." To similar effect see Bradbury v. Higginson, 167 Cal. 553, 140 P. 254.[5]

Of course it is often a matter of difficulty to apply the parol evidence rule. One would expect to find, and there are to be found in the California decisions, cases holding rather broadly that in resolving questions of intent it is the duty of the court to admit parol evidence of the surrounding circumstances in order that the court may place itself in the same situation as the contracting parties were; but in the same cases it is recognized that the language of the contract must govern its interpretation. And a consideration of the various holdings cited on both sides leaves little room for doubt that in respect of the agreement before us reformation affords the only possible remedy.

2. The considerations prompting the trial court to decline reformation may be summarized thus: (a) Appellee acquired the license agreement in good faith and for value, and reformation would operate to the prejudice of rights thus obtained;[6] (b) the agreement took on a definite status in the reorganization proceeding, that is to say its obligations became fixed or were thereafter limited to those appearing on its

---

[3] See also § 1856, Cal.Code Civ.Proc.

[4] See earlier decision in the same case reported in 7 Cal. 282.

[5] For additional illustrative California decisions consult Palm Springs-La Quinta Development Co. v. Palm Springs Land & Irrigation Co., 36 Cal.App.2d 730, 98 P.2d 530; White v. Greenwood, 52 Cal. App. 737, 199 P. 1095; Foley v. Euless, 214 Cal. 506, 6 P.2d 956; Harrison v. McCormick, 89 Cal. 327, 26 P. 830, 23 Am.

St.Rep. 469; De Witt v. Duncan, 46 Cal. 342.

[6] The holding in this respect follows a state statute (§ 3399, Cal.Civ.Code), which provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved, so as to express

face; and (c), Black's failure to file any claim in that proceeding in respect of the subject matter of his present litigation forecloses him from now asserting a right to reform the contract.

Reformation is peculiarly an equitable remedy, and the parties to this suit are not equally at fault. The omission from the agreement of the invention in question was due solely to appellant's own mistake or neglect. There is nothing in the record to support an inference that appellee knew the writing was defective, or that it had notice of the latent or undisclosed obligation now sought to be imposed upon it. The court so found. The very patent on which the present claim to royalties is predicated was not issued until after the license agreement had been transferred to the present holder; and there was no substantial showing that the latter either knew or should have known that the use of chrome alloy tubing or containers was the subject of a patent monopoly. The payment of royalties during the progress of the several court proceedings was without significance for the royalty was payable at all events so long as any of the described patents involving Black's process continued to be used. It should be added that chrome alloy tubing was not in use in the plant of appellee's predecessor until at least as late as 1930. Circumstances of other kinds said to be sufficient to put appellee on inquiry are too remote and inconsequential to merit detailed attention.

These considerations are really determinative of the inquiry. But because appellee assumed the agreement and undertook in terms to perform the obligations of the trustee thereunder, it is elaborately argued that the company now holds the contract subject to all its "plights and infirmities," including the same right of reformation that might have been asserted against the trustee of the old Richfield Company. However, what was obviously intended to be assumed was not some unspoken and undisclosed understanding, but a tangible and quite definite written contract. In his zeal to obtain his pound of flesh appellant mistakes the nature of his suit. He is seeking relief which equity alone can afford him; and the equities of his situation are patently less appealing than those of his adversary. We do not understand it to be the province of equity to surprise a good faith party into a contract. If appellant's thesis were accepted, appellee would even be surprised into a situation where it would be foreclosed from questioning the validity of what it claims is an invalid patent.

Black had opportunity to assert his right in the 77B proceeding. This he denies on the authority of Consolidated Gas Elec. L. & P. Co. v. United Rys. & Elec. Co., 4 Cir., 85 F.2d 799, holding that a claim under an executory contract does not arise until the contract has been rejected. The decision is not helpful. The important fact is that at no stage of the reorganization proceeding did Black assert or claim that the executory agreement imported something other than it said. Had he done so opportunity would have been afforded to reject the contract.

Subdivision h of § 77B provides that when the property dealt with is transferred to a corporation provided for in the plan, it shall be free and clear of all claims of the debtor, its stockholders and creditors, except such as may consistently be reserved in the order of confirmation. It is not contended that the order in terms reserved the right to reform this contract. Obviously reformation at this juncture would place appellant in a preferred position, prejudicial to the rights not only of other creditors of the old Richfield Company but to the rights of those who supplied the very large amount of working capital requisite to the operations of the new.

Affirmed.

STEPHENS, Circuit Judge (dissenting).

I dissent. While there are important ultimate factual issues in this case, they are created almost, if not quite, of undisputed material facts. I have been unable to fit these material facts into the conclusions reached by my associates. In short, I think the contract between appellant and Richfield (old company) cannot be fairly read as excluding the patent, specific mention of which was inadvertently omitted from the patent list written into the contract. Therefore, I think that this court should direct a finding along these lines and that an accounting should follow.

---

that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." The concluding phrase of this statute is merely declaratory of a general equitable principle governing the reformation of instruments.