PERMA–FIT SHOULDER PAD CO., Inc., Plaintiff-Appellee,

v.

BEST MADE SHOULDER PAD CORP., Shopad Co., Inc., Chic Pad Corp., Samuel Weber, Harold Weber, Murray Weber, Defendants-Appellants.

No. 8, Docket 23016.

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1954.

Decided Jan. 20, 1955.

Mock & Blum, Asher Blum, New York City, for defendants-appellants.

Kane, Dalsimer & Kane, New York City (Philip T. Dalsimer, Haynes N. Johnson and Alfred Sobol, New York City, of counsel), for plaintiff-appellee.

Before CLARK, Chief Judge, and FRANK and HARLAN, Circuit Judges.

HARLAN, Circuit Judge.

The District Court has held valid and infringed by the defendants-appellants U. S. Patent No. 2,478,340 for an "Apparel Pad and Method of Making the Same." The patent was issued on August 9, 1949 to Joseph A. Talalay, and thereafter he assigned it to the plaintiff-appellee.

The contending parties are rivals in the business of manufacturing shoulder pads used in male and female garments. Both the patented and allegedly infringing shoulder pads comprise: (1) a concavo-convex or scoop-shaped filler composed of open-mesh wool fibers coated and bonded together with oil-resistant rubber, and (2) an outer layer of cotton or other ordinary material secured to the filler by stitching or some other means. It is only the filler that is claimed as invention. The virtues of this kind of shoulder pad are said to be its light weight, resiliency, and ability to undergo dry cleaning without the need for reshaping. When the appellee introduced its pads on the market in 1946—its patent application being then pending—they met with quick and favorable response. Thereafter the appellants commenced to make shoulder pads of the same type and characteristics.

Claims 11 to 19 inclusive of the patent are in issue. Claims 11, 12, 13, 14, 18 and 19 are product claims covering the pad itself. Claims 15, 16 and 17 are method claims embracing the means of constructing the pad. Typical of the product claims are claim 11 (comparable to claims 18 and 19) [1] and claim 12

1. "13. An apparel pad comprising a multiplicity of laminations of fibrous material in association with an oil-resistant, heat plastic, synthetic rubber, the laminations being molded as a unit to concavo-convex, thin-margin shape, in which they are held by the bonding substance, laminations of the pad being of different extensiveness appropriate to the positions they occupy in the finished thin-margin pad, and being of open-mesh form in all of the three dimensions.

"19. An apparel pad of concavo-convex shape having its thickness graduated from a relatively thick portion to a thin marginal portion and comprising a set of

748

(comparable to claims 13 and 14) [2], reading as follows:

"11. An apparel pad comprising a multiplicity of laminations of fibrous material in open-mesh web form and having substantially the fiber size and kink characteristic of wool, the fibres being individually coated and adhered to one another at their crossing points by a substance having substantially the resilient deformability of soft-rubber, the laminations being of different sizes and contours by reason of which the apparel pad is of concavo-convex shape, the laminations being secured to one another at least at selective points, and the structure being of open-mesh form in all of the three dimensions.

"12. An apparel pad of concavo-convex shape, having its thickness graduated from a relatively thick portion to a thin marginal portion and comprising a stereoreticulate mass of fibers having substantially the fiber size and kink characteristics of wool, the fibers being individually coated and bonded to one another at their crossing positions by a substance which has substantially the resilient deformability of soft-rubber and of itself constitutes a three-dimensional, open-mesh network."

Typical of the *method* claims is claim 15 (comparable to claims 16 and 17),[3] which reads:

"15. The method of making an apparel pad of concavo-convex shape, having its thickness graduated from a relatively thick portion to a thin marginal portion which comprises plying up and adhering to one another a multiplicity of three-dimensional-network sheets of elastomer-bonded fiber having substantially the fiber size and kink characteristics of wool and shaping the plied-up structure to give it the said graduated thickness, the method including the step of so cutting the sheets that they are of graduated sizes."

parts attached to one another, each of said parts comprising a stereoreticulate mass of unwoven fibers coated and bonded to one another at their crossing positions by a bonding substance having substantially the resilient deformability of soft rubber, the fibers having substantially the fiber size and kink characteristics of wool."

2. "13. An apparel pad of concavo-convex shape, having its thickness graduated from a relatively thick portion to a thin marginal portion and comprising a stereoreticulate mass of fibers having substantially the fiber size and kink characteristics of wool, the fibers being individually coated and bonded to one another at their crossing positions by an oil-resistant synthetic rubber which of itself constitutes a three-dimensional, open-mesh net-work.

"14. An apparel pad of concavo-convex shape, having its thickness graduated from a relatively thick portion to a thin marginal portion and comprising a stereoreticulate mass of fibers having substantially the fiber size and kink characteristics of wool, the fibers being individually coated and bonded to one another at their crossing positions by neo-prene, the neoprene constituting a three-dimensional net-work."

3. "16. The method of making an apparel pad of concavo-convex shape, having its thickness graduated from a relatively thick portion to a thin marginal portion which comprises plying up and adhering to one another a multiplicity of three-dimensional-network sheets of neoprene-bonded fiber having substantially the fiber size and kink characteristics of wool and shaping the plied-up structure to give it the said graduated thickness, the method including the step of so cutting the sheets that they are of graduated sizes.

"17. The method of making an apparel pad which comprises assembling a plurality of substantially flat stereoreticulate sheets of fibrous material, each being of substantially uniform thickness throughout its extent, in association with an oil-resistant, heat-plastic, synthetic rubber, and molding the assembly as a unit from substantially flat shape to pronouncedly concavo-convex, thin-margin shape, the method including the step of cutting the sheets to different sizes appropriate to the positions they occupy in the finished thin-margin pad."

The District Court held all of these claims infringed, but it seems quite clear that this holding was too broad, at least so far as it related to the principal methods used by the appellants in constructing their pads. The question of infringement is best highlighted by comparing the appellants' methods of construction with those of the appellee, whose methods and resulting product conform to what is described in the claims in issue, particularly when read in connection with the patent specification. The appellee purchases from the Sponge Rubber Products Company thin sheets of a patented product called Texlite, consisting of wool fibers coated and bonded with Neoprene, an oil-resistant synthetic rubber manufactured by the du Pont Company. The appellee then constructs its shoulder pad fillers by taking one of these Texlite sheets and cutting from it a number of pieces of graduated size and shape, so that when the pieces are piled one on top of the other the structure takes on a dome-like shape. The piled-up pieces are bonded together by a flexible adhesive and then placed in a mold under heat and pressure, which gives the structure its final and permanent scoop-like shape.

The principal methods used by the appellants in constructing their shoulder pads were different. Instead of using piled-up pieces of pre-cut rubberized wool fibres, they employed *blocks* of such material composed of a number of laminations—purchased from the Penn Pad Company in that form—from which they appear to have carved or skived a dome-shaped piece, which was then molded under heat and pressure into its final scoop-shaped form. Amounting to substantially the same thing, we think, was another method in which the appellants themselves built their own blocks from laminations of the material, the remaining procedures being the same as in the first method. While appellants assert that their molding process was different from that employed by the appellees, we fail to perceive from the testimony that these features of the operation differed in any material respect, and we therefore take them as being the same. Even so, we think that the use of blocks instead of separate laminations of the rubberized material in constructing the fillers was sufficiently different so as to constitute the appellants' method of constructing the pads *not* an infringement of the *method* claims (15, 16, 17) of the appellee's Patent. Whether there was infringement of the *product* claims of the Patent which refer to a shoulder pad filler composed of laminations or layers of the rubberized material (claims 11, 18, 19)—because the blocks used by the appellants were composed of such laminations—we need not determine, for we think that the pads constructed by the two methods just described did infringe product claims 12, 13, and 14, which make no reference to the laminated feature of the structure. Furthermore, at some stage the appellants appear also to have constructed their fillers from separate sheets, instead of blocks. Although the evidence as to this method of construction is scanty, we shall assume that the pads made in this way infringed all contested claims of the Patent. We are thus confronted with the need for deciding whether any of the claims in issue are valid, and for the reasons now to be discussed we are of the opinion that the Patent is invalid for lack of invention.

Concededly, shoulder pads themselves are not novel. Such articles have been on the market for many years. Nor is the scoop-shaped type of shoulder pad new. The prior art shows such a structure displayed as early as 1887 by U. S. Patent No. 347,120, issued to Rufus M. Eastman on November 29, 1887, and again by U. S. Patent No. 2,172,499, issued to Francois Chassaing on September 12, 1939. The features of the appellee's shoulder pads upon which the claim of invention must stand or fall relate to one or more of the following factors: (1) the material used in the filler, (2) the construction of the filler by using several laminations of this material, and (3) shaping of the filler by fashioning the several laminations and molding the

entire structure. The use of laminations of material in constructing shoulder pads, and the fashioning of the several laminations, are both old. Both are displayed by U. S. Patent No. 1,698,144, issued to Arnold G. Sladdin in 1929, which also shows the use of adhesives to bond the several laminations. Likewise molding under heat and pressure is not new, it being exemplified, even though as to a different material, by the Eastman patent. Thus all that is left to sustain the claim of invention here is the material out of which the filler is made.

The appellee does not claim to be the inventor of Texlite, the material used in its filler. That product is the subject matter of a prior patent of Anselm Talalay, the son of Joseph Talalay; and Sponge Rubber makes the material under a license issued to it by Anselm. Perhaps more favorably than the disclosures of Anselm's patent warrant, we shall assume *arguendo* that it does not disclose the use of his material in a shoulder pad,[4] and that there is no other prior disclosure of the subject matter of Joseph's patent. Then what we come down to here is whether Joseph Talalay's suggested use for shoulder pads of his son's already patented Texlite amounts to invention.

■ Ordinarily, merely to suggest for the first time the use of an old material in an old product is not inventive. The bulk of recent cases involving substitution of one material for another have reached this result. See Walker, Patents, § 29 (Supp.1954). The basis for the rule and the exception to it are stated as follows in Gasoline Products Co. v. Coe, 1936, 66 App.D.C. 333, 87 F.2d 550, 557:

> " * * * [Defendant] seeks to invoke the well settled rule of Hotchkiss v. Greenwood, 11 How. 248, 266, 13 L.Ed. 683, that mere substitution

of materials in a known machine cannot be regarded as invention entitling to a patent for the reason that in such cases, generally speaking, the difference is formal and affords nothing more than 'evidence of judgment and skill in the selection and adaptation of the materials.' But there is a well known exception to that rule, thus stated by the Supreme Court in Hicks v. Kelsey, 18 Wall. 670, 673, 21 L.Ed. 852:

> " 'The use of one material instead of another in constructing a known machine is, in most cases, so obviously a matter of mere mechanical judgment, and not of invention, that it cannot be called an invention, *unless some new and useful result, an increase of efficiency, or a decided saving in the operation, is clearly attained.*' [Italics supplied.]

> "This was put definitely into the positive in Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 496, 497, 23 L.Ed. 952, where the Supreme Court said:

> " 'But where there is some such new and useful result, where a machine has acquired new functions and useful properties it may be patentable as an invention, though the only change made in the machine has been supplanting one of its materials by another.' "

This language cannot be taken literally, for if it were, the rule would disappear into the exception. Every improvement wrought by substitution of materials would be expected to give new and useful properties to the article improved. We think, therefore, that this language must instead be taken to require the courts to evaluate in each case the significance of the advance in the art made by the alleged invention, as was suggested in United Shoe Machinery

---

4. In describing the characteristics of the new material the patent states, among other things, that it could be "subjected to suitably light molding pressure * * * in a contoured mold for producing desired shapes", that it was especially suitable as "a cushioning material", and that it "is well suited for use in articles requiring to be dry-cleaned in the course of their use."

Corp. v. E. H. Ferree Co., 2 Cir., 1933, 64 F.2d 101, 103. Cases in which substitutions have been held inventive have for the most part involved the solution of a significant problem which prior efforts had failed to handle satisfactorily; see, e. g., George Frost Co. v. Cohn, 2 Cir., 1902, 119 F. 505 (substitution of rubber for metal in garter buttons, eliminating slippage and tearing); Carbide & Carbon Chemicals Corp. v. Coe, 1938, 69 App.D.C. 372, 102 F.2d 236 (substitution of vinyl resin films for other coatings of metallic food wrappers, preventing contamination of the food from chemical reaction with the wrapper); Gasoline Products Co. v. Coe, supra (substitution of sulphide-resistant steel alloys for other materials in pipes used for cracking of petroleum compounds, thereby substantially preventing internal corrosion of pipes and consequent frequent explosions); or at least a substantial improvement in the existing method of handling the problem, see, e. g., United Shoe Machinery Corp. v. E. H. Ferree Co., supra (substitution of aluminum for cast iron arm in shoe cutting machine, thereby making work of operator substantially less difficult); Yablick v. Protecto Safety Appliance Corp., 3 Cir., 1927, 21 F.2d 885 (substitution of copper sulphate for sulphuric acid as ammonia absorbent in gas masks, thereby eliminating harmful vapors and corrosion of cannister). We are unable to say that the improvement in shoulder-pad manufacture which the present patent describes is as significant an advance as these others. Generally satisfactory shoulder pads have been in use for some time. This improvement therefore cannot be said to have filled a gap in the existing art, nor even to have perfected a barely adequate device for dealing with a problem. It can hardly be thought as substantial an advance over existing art as that involved in Trubenizing Process Corporation v. Jacobson, 2 Cir., 1938, 98 F.2d 899 (substitution of fabric sandwich enclosing porous cellulose derivative for conventional shirt collar materials, thus giving semi-soft collars "starchless stiffness," while retaining their permeability to air and water); but seems to be in much the same class as Fowler v. Honorbilt Products, 3 Cir., 1942, 131 F.2d 153 (substitution of sisal for cotton in upholstery pads); and in both these cases no invention was found.

Furthermore, it is much more difficult here than in the cases cited above to say that the improvement was beyond what could be expected of one skilled in the art. In all those cases, the substituted material was a well-known one, generally available to practitioners of the trade. Their failure to make prompt use of the substitute material argues against the obviousness of the substitution. But · here there is no indication that Texlite was generally known to the shoulder-pad trade for any length of time before Joseph Talalay made his disclosure, and the same argument cannot be made. Indeed the very opposite seems more likely. The desirable qualities of a good shoulder pad—lightness, resiliency, complete identification with the garment, and ability to hold its shape—are no secret. A variety of fillers was in use, and manufacturers were on the lookout for new materials. When Anselm Talalay came along with Texlite it can hardly be supposed that its qualities would not have been quickly recognized by one skilled in the art as admirably suited for use in making shoulder pads. And that is just what Anselm Talalay testified was his father's immediate reaction when he showed him his new material.

While none of the prior patents relied on by the appellant may have been an anticipation of the Joseph Talalay patent, the state of the prior art which they disclose persuades us that nothing disclosed in the patent in suit rises to the level of invention, and we therefore hold this patent invalid.[5]

Reversed and complaint dismissed.

5. While this appeal concerns only claims 11–19, our conclusions as to the patent's invalidity would seem to apply equally to claims 1–10.